We do not consider the issue of abuse of discretion not raised in the trial court, nor whether retroactive approval was possible.

The case must be and is reversed with directions to disallow the fees, compensation, and reimbursements awarded to United Bank of Denver and to Citibank.

Jerry Wayne WATTS, et al, Appellees,

v.

John T. HADDEN, Warden, et al, Appellants.

Nos. 80–1384, 80–1903.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted March 18, 1981.

Decided June 11, 1981.

Rehearing Denied Sept. 10, 1981.

William G. Otis, U. S. Dept. of Justice, Washington, D.C. (William C. Bryson, U. S. Dept. of Justice, Washington, D.C., Clair Cripe, Bureau of Prisons, Washington, D.C., Michael A. Stover, Rockne J. Chickinell, U. S. Parole Commission, Washington, D.C., and Joseph F. Dolan, U. S. Atty., Denver, Colo., with him on the brief) for appellants.

Daniel J. Sears, Denver, Colo., for appellees.

Before McWILLIAMS, WILLIAM E. DOYLE and McKAY, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

## PART I

In this case, the plaintiffs, who are inmates of the Federal Correctional Institute at Englewood, Colorado, have challenged the interpretation that the Bureau of Prisons has given to the Federal Youth Corrections Act, 18 U.S.C. § 5005, *et seq.*, hereinafter called the YCA. There are eleven petitioners appellees who challenge the alleged failure of the United States Bureau of Prisons to observe the requirements of the Act. A similar challenge has been filed against the United States Parole Commission in *Watts v. Hadden.*

The issue in the present case is whether under the Act the inmates have to be segregated, such that all inmates within the institution, with perhaps minor exceptions, have to be persons who have been sentenced under the Youth Corrections Act. The Bureau of Prisons' position is that so long as they observe the treatment and training provisions of the Act, it is perfectly permissible for the Bureau to have older prisoners within the institution.

The petitions here were filed under 28 U.S.C. § 2241(c)(3), which is a federal habeas corpus statute. Each of the petitioners was confined at the Federal Correctional Institute at Englewood under YCA sentence. They alleged that they were not being segregated from adult offenders nor receiving treatment and supervision as required by the YCA.

A trial was held in the United States District Court for the District of Colorado and on April 20, 1979 a memorandum opinion was issued by United States District Judge Richard Matsch. This opinion contains extensive findings of fact together with an interpretation of the YCA. *See Watts v. Hadden*, 469 F.Supp. 223 (D.Colo. 1979). In general, the court concluded that the petitioners were being held in custody in violation of the YCA. But rather than ordering release from custody, the court directed the Bureau of Prisons defendants to submit a written plan which would implement the YCA as interpreted by the court.

The Bureau of Prisons plan called for classification and treatment of YCA offenders at the Englewood FCI. YCA offenders were to have segregated living quarters and segregated treatment programs. At all other times, YCA inmates would not be segregated from other inmates. Thus, the plan that was submitted by the Bureau of Prisons would have allowed integration of the institution itself apart from the living quarters, housing inmates who were not sentenced under the YCA.

On January 17, 1980, pursuant to Rule 54(b) of the Fed.R.Civ.P., the trial court entered a final judgment with regard to the issues involving the Bureau of Prisons. The judgment of February 5, 1980, which is referred to as the amended judgment, declares that the plan submitted by the Bureau of Prisons is in compliance with the YCA, except that it does not provide for complete segregation of YCA offenders. The judgment directs respondents to place those petitioners still in prison in a facility designed and operated so as to separate them from non-YCA offenders. It is this judgment that the Bureau of Prisons has appealed and which is in question.

I.

### Objectives and Provisions of the Youth Corrections Act

The enactment of this Act by Congress occurred in 1950. Its purpose was to provide an alternative sentencing program for federal judges for persons who were under the age of 22 years. The intent was to promote rehabilitation of convicted youths believed to show promise of becoming useful citizens, and to thus "avoid the degenerative and needless transformation of many of these young persons into habitual criminals."[1] Congress, in the legislative history, showed that its view was that existing methods of treatment of criminally inclined youths were not solving the problem and that mixing of youth offenders with older criminals was resulting in criminalization of the young.

> By herding youth with maturity, the novice with the sophisticate, the impressionable with the hardened, and by subjecting youth offenders to the evil influences of older criminals and their teaching of criminal techniques, without the inhibitions that come from normal contacts and counteracting prophylaxis, many of our penal institutions actively spread the infection of crime and foster, rather than check, it. 1950 U.S.Code Cong.Service 3983, 3985.

(hereinafter "1950 U.S.Code Cong.Service 3983.")

---

1. H.R.Rep.No.2979, 81st Cong., 2d Sess., reprinted in [1950] U.S.Code Cong. Service 3983

Thus a principal purpose, as expressed by the Congress, was the segregation of these youths from older criminals who can be characterized as hardened. In the YCA, Congress sought to address the problem with a comprehensive scheme of pre-sentencing study, sentencing options, individualized placement and treatment, and supervised release. There have been various amendments over the years which primarily touch upon administrative and organizational schemes. However, the basic provisions, including those here relevant, have remained unchanged. Under 18 U.S.C. § 5010, a judge sentencing an individual who is between 18 and 22 years of age has a number of sentencing options. The court may suspend sentence and place the youth offender on probation. § 5010(a). In lieu of any other sentence of imprisonment provided for an offense, the court may sentence the youth offender to an indeterminate sentence of up to four years confinement and up to two years on conditional release. §§ 5010(b) and 5017(c). It is undisputed that in some cases these provisions can and do result in youth offenders spending longer periods in confinement than they would have if sentenced as adults.[2] In the event that a term longer than six years is provided for the offense by another statute, the court may choose to sentence the youth to an indeterminate sentence for such longer period. §§ 5010(c) and 5017(d).

Under 18 U.S.C. § 5010(d) the court may sentence a youth offender under any other applicable penalty provisions, but only if the court finds that the youth will not benefit from treatment under the YCA. This is a finding which is to be expressly made on the record. *Dorszynski v. United States*, 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974).

Offenders between 22 and 26 may be sentenced pursuant to the YCA, but only if the court finds reasonable grounds to believe the young adult offender will benefit from treatment provided by the Act. 18 U.S.C. § 4216 (formerly § 4209). Thus, in the statutes there is a strong thread that runs throughout the YCA that shows a legislative preference for sentencing under YCA for offenders under 22 years of age. While offenders older than 22 may be sentenced thereunder in special cases, it was not the preference of Congress that they be so sentenced as it was for the younger offenders. S.Rep.No.2013, 85th Cong., 2nd Sess., reprinted in [1958] U.S.Code Cong. and Ad.News 3891, 3892. Finally, § 5010(e) allows the court to commit the youth offender for study and observation in order to assist the court in determining whether treatment under the Act will prove beneficial.

After the pronouncement of sentence under the YCA, every offender must first be sent to a "classification center or agency" for a complete study and recommendation regarding treatment. 18 U.S.C. § 5014. On receipt of the recommendation, the Director of the Bureau of Prisons has three options. Conditional release under supervision can be recommended to the Parole Commission. Or, the Director may transfer the youth offender to an agency or institution for treatment. Finally, the Director may "order the committed youth offender confined and afforded treatment under such conditions he believes are best designed for the protection of the public." 18 U.S.C. § 5015(a). 18 U.S.C. § 5015(b) further permits the Director to "transfer at any time a committed youth offender from one agency or institution to any other agency or institution."

18 U.S.C. § 5006(f) defines treatment to mean "corrective and preventive guidance and training designed to protect the public by correcting the antisocial tendencies of

---

**2.** For this reason, undoubtedly, many persons eligible to be sentenced as youth offenders request that the court not sentence them under the YCA but rather give them a definite sentence so that they can look forward to release in a particular period of time. One of the petitioners here, who was sentenced under 18 U.S.C. § 5010(b), Kevin Crisman, was convicted of a misdemeanor which carries a maximum term of three months in confinement for adult offenders. As of the September 14, 1978 hearing below, Mr. Crisman had been in prison almost two years. *But see United States v. Amidon*, 627 F.2d 1023 (9th Cir. 1980).

youth offenders." 18 U.S.C. § 5011 is the central provision of the Act regarding treatment. It provides:

> Committed youth offenders not conditionally released shall undergo treatment in institutions of maximum security, medium security, or minimum security types, including training schools, hospitals, farms, forestry and other camps, and other agencies that will provide the essential varieties of treatment. The Director shall from time to time designate, set aside and adapt institutions and agencies under the control of the Department of Justice for treatment. Insofar as practical, such institutions and agencies shall be used only for treatment of committed youth offenders, and such youth offenders shall be segregated from other offenders, and classes of committed youth offenders shall be segregated according to their needs for treatment.

The Director is required to make periodic examinations and reports on committed youth offenders to the Parole Commission. 18 U.S.C. § 5016. The full Commission is charged with determining when and under what conditions a committed youth offender should be released. 18 U.S.C. §§ 5005, 5017.

The legislative history also reveals that the YCA scheme for sentencing, treatment and release was founded on two key sources of information. An "extensive and thorough" study of punishment for crime, which spanned several years, was conducted by a distinguished committee of the Judicial Conference of the United States. A subcommittee gave particular attention to the problem of youth offenders.

> Reliable statistics demonstrate, beyond possible doubt, that the period in life between 16 and 23 years of age is the focal source of crime. It is during that period that habitual criminals are spawned.
>
> .      .      .      .      .
>
> Sociologists and psychiatrists tell us that special causations which occur in the period between adolescence and manhood are, in a large measure, responsible for antiso-

cial conduct trends manifested by persons in that age group.

.      .      .      .      .

> Most of the causes which contribute to anti-social conduct of youth offenders in the period between adolescence and maturity disappear when the youth reaches full maturity. The problem is to provide a successful method and means for treatment of young men [convicted of crime] —a method and means that will effect rehabilitation and restore normality, rather than develop recidivists. 1950 U.S.Code Cong.Service 3983, 3984–5.

A second major source of information was the Borstal System, which had been in successful operation in England for several decades. 1950 U.S.Code Cong.Service 3983, 3987–89. The Borstal System began in 1894 as an experiment. It was carried on in a prison in which one wing was set aside for offenders age 16 to 23. By 1904 an entire institution had been devoted to intensive rehabilitation programs for youths. By 1950 thirteen institutions of varying types had become involved in the English system, with each institution providing a different type of program speciality. The system included careful study and classification to an appropriate institution, individualized treatment and assistance, and continued counseling after release. In light of the success of this system, the legislative history asserts that the YCA is "not experimental," that the YCA plan "will work," and that through the plan "more than 70 per cent [of youth offenders] can be rehabilitated." 1950 U.S.Code Cong.Service 3983, 3985, 3987, 3993.

Section 5012 provides that no YCA commitments are to be made until the Director has certified that proper and adequate treatment facilities are available. In 1954, the Director notified the courts in seven circuits that a facility at Ashland, Kentucky was being converted into a classification center and treatment facility. In 1956, courts in the Eighth, Ninth and Tenth Circuits were notified that the facility at Englewood, Colorado was being similarly converted.

## II.

*Trial court findings as to changes in the segregation of youth offenders*

Following the receipt of evidence the trial court entered judgment, together with a memorandum opinion and order dated April 20, 1979. *Watts v. Hadden*, 469 F.Supp. 223 (D.Colo.1979). The trial court found that Englewood was operated as a Federal Youth Center from 1956 to 1976. Some adults were housed at Englewood during this period but the facility was used primarily for custody of YCA and Federal Juvenile Delinquency Act offenders. In 1976, the "Federal Youth Center" designation was eliminated throughout the system; Englewood became an FCI.

The court further found that the Bureau of Prisons had determined that classification of prisoners to institutions should no longer be based on an offender's YCA status. It was determined that Englewood was to be used to house adults and YCA offenders in accordance with a new classification system under which each federal facility was rated according to the level of security provided. There are six levels of security, level six being the highest and most secure; Englewood is rated as a level three or medium security institution. Each offender is rated to determine his security requirements under a point system based on history of escapes, history of violence, type of detainer, severity of current offense, expected length of confinement and type of prior commitment. All offenders, whether YCA or not, are assigned to institutions based on these security ratings. John T. Hadden, Warden at Englewood, testified that judicial recommendations, location of an inmate's home and separation of inmates for reasons of safety are other factors which are considered in placing offenders.

It is not disputed that, at least in the Western Region, the Bureau of Prisons no longer makes any effort to place YCA offenders in institutions which exclusively or primarily house those who are sentenced under the Act. The trial court found that each of the petitioners was designated for confinement at Englewood under the new classification system. None of the petitioners were ever sent to a classification center or agency for study or treatment recommendation before being sent to a prison facility, nor have any of the petitioners ever been placed in an exclusively YCA facility.

The record, together with the findings of the trial court, brings home the fact that several changes have occurred at Englewood as the result of orders of the Bureau of Prisons since this new classification system went into effect. The number of YCA inmates has declined significantly; many of the YCA inmates have been released or sent to institutions of lesser security levels. The population of the institution has increased to almost 500 although the design capacity is 350. Englewood now houses male inmates from ages 18 and up. The average age of YCA inmates is about 20, while the average age of those sentenced as adults is about 28. The emphasis in the programs provided for inmates has changed to meet the changing needs of an older population. Because fewer inmates lack the equivalent of a high school education, the programs now emphasize advanced education and vocational training. The size of the educational staff and the number of programs have been reduced due to a lowered demand.

There is increased emphasis on a prison industries program, participation in which earns funds for use at the prison commissary. Many of the course offerings, particularly those at the high school level, are offered only during the daytime hours, requiring inmates to choose between those courses and the opportunity to earn money in the industries program. Although the prison staff recommends programs to inmates, no inmate is required to participate in any program. Each inmate may select his own activity without adverse consequence. Thus, no distinction is made between YCA inmates and non-YCA inmates in program offerings, and inmates are not segregated in their daily activities.

## III.

### Reasons for integrating youth offenders with older offenders

The decision made by the Bureau of Prisons to integrate YCA and other offenders at Englewood and throughout the Western Region was based largely on the experience, reflected in a study conducted at the FCIs in El Reno, Oklahoma and Texarkana, Texas, that mixing of older and younger offenders resulted in decreased violence. Also, it had become necessary to remove all juvenile delinquents from facilities where they came in contact with older offenders, 18 U.S.C. § 5039. This resulted in a reduction of the population in Englewood. In recent years, the total inmate population in federal facilities has increased from 20,000 to approximately 30,000, resulting in overcrowding. At the same time, the Englewood facility remained relatively uncrowded.

The Regional Director of the Western Region indicated that the differences between the Federal Youth Centers and other federal facilities had become less noticeable over the years. This was due largely to the fact that education and self-improvement programs had been extended to inmates throughout the prison system. The Bureau of Prisons had found that some younger and relatively unsophisticated offenders were being sentenced under adult provisions rather than the YCA. At the same time, relatively sophisticated criminals were receiving YCA sentences, particularly in the young adult offender group. This had resulted in the Bureau of Prisons placing less sophisticated young offenders in the same facilities, whether sentenced under the YCA or not, while more sophisticated YCA offenders had to be removed and placed in more secure facilities. Notwithstanding this, until the new classification system was started, YCA offenders had been, for the most part, placed in one of the six facilities which primarily housed youth offenders. At the present time, YCA offenders are scattered among twenty institutions in the federal system.

The trial court found, with substantial support, that a primary reason for the integration of YCA and other offenders was a shift in penological philosophy within the Bureau of Prisons. At the time the YCA was passed the "medical model" was widely accepted by criminologists within and outside the Bureau. Under this theory, it is thought that an individual can be evaluated and treated so as to, in effect, "cure" criminal tendencies. The testimony of Warden Hadden indicated that the philosophy of the Bureau had shifted in recent years. Now it is thought that rehabilitation cannot occur unless it is desired by the inmate. The trial court found that the most important purposes of confinement are now believed to be deterence and retribution. The policy of "optional programing" provides inmates with various self-improvement opportunities from which they may select.

As noted by the trial court, the commendable candor of the witnesses, as well as policy statements introduced as exhibits at the trial of this action, demonstrated the Bureau of Prisons' view that the YCA has outlived its usefulness. Accordingly, the Bureau abandoned attempts to segregate and provide special treatment for YCA offenders. For reasons of administrative flexibility, institutional discipline, and, apparently, disillusionment with the optimistic rehabilitative approach embodied in the YCA, the Bureau began treating YCA offenders like all other offenders.

## IV.

### Analysis of the Bureau of Prison Plan

In response to court decisions a separate YCA residential unit was established at Englewood for the purpose of segregating YCA offenders from other inmates during sleeping hours. YCA and other offenders continue to share all other facilities and activities on an unsegregated basis.

In the April 20, 1979 memorandum opinion and order, the trial court found that mandatory requirements of the Youth Corrections Act were being violated. Specifically, the trial court found that there was a lack of classification centers or agencies,

segregated institutions, examination and re-examination of YCA offenders, and treatment according to individual needs. The court recognized that the precise manner in which the statutory requirements are to be implemented is within the discretion of the Bureau of Prisons; the trial court directed the Bureau to submit a plan for implementation of the YCA as interpreted by the court.

Under the Bureau of Prisons plan Englewood is to be designated as a YCA classification center for the Rocky Mountain and Upper Plains region. The plan calls for a thorough study of each offender and a report within 30 days. If the offender's needs for treatment are not met by available programs, he will be transferred to a YCA unit in a more appropriate institution. The plan further provides for a thorough review of each YCA offender's progress every 90 days, with reclassification to a more appropriate facility a continuing option.

A treatment program is to be developed and periodically reviewed for each YCA offender by the YCA unit team. Each YCA offender is to be required to participate in an assigned treatment program involving forty hours per week of activities. The plan calls for YCA offenders to be segregated from other offenders during treatment hours with one exception. If the staff determines at initial classification that "basic treatment needs" have been met, a YCA inmate will be permitted to request assignment to an industrial job. Such assignments would involve mingling of YCA and other inmates. Industrial assignments may be full or part time, provided work will not interfere with the treatment program.

The plan lists a number of programs which are available to YCA inmates. It indicates that additional programs are to be developed as new treatment needs are identified. The programs listed are: adult basic education, adult secondary education, postsecondary education, special reading and math, physical education, vocational training, industrial apprenticeship, counselling, town hall, social activities, outward bound, and pre-release transfer to half-way houses for study or work release.

Part of the plan calls for a YCA housing unit which is off-limits to non-YCA inmates. Thus, while they are in their unit and during treatment hours, YCA inmates are segregated from non-YCA inmates under the Bureau plan. At all other times, however, YCA inmates would under the plan be mixed with non-YCA inmates. Mixed activities would include the dining hall, movies, hobby shop, inmate organizations, chapel, visiting room, hospital, law library, gymnasium, auditorium, music and outdoor recreation. Written requests for separate use of such facilities by YCA inmates would be accommodated, if possible.

The reasons given for rejection of separate YCA institutions are: First, many YCA inmates would have to be placed further from their homes and families if fewer institutions are available. Second, various types of YCA offenders would have to be mixed within each institution, a result "precisely contrary to the legislative intent." Finally, loss of management flexibility in administering the prison system as a whole would occur.

The plan also notes that greater segregation of YCA and non-YCA inmates within Englewood was considered and rejected. The reasons for this position are: The Bureau points to research suggesting that mixing of age groups reduces violence, because older inmates exert a "stabilizing" influence on YCA offenders. Secondly, the plan asserts that further segregation at Englewood, "while physically possible . . . would decrease the opportunities available to all . . . ."

After the court had received the plan, objections from the petitioners were also received and an evidentiary hearing was held. On January 17, 1980 the trial court entered a final judgment on the issues concerning the Bureau of Prisons pursuant to Rule 54(b), Fed.R.Civ.P. The trial court found the plan to be in substantial compliance with the YCA with regard to classification and treatment.

The question now to be decided is whether complete segregation is required. The respondents contend that such complete segregation is impracticable and would be disruptive to large numbers of offenders. More particularly, they have reported that there are approximately 2,200 YCA offenders in the federal prison system and that to place all of them as close as possible to their homes but in institutions used only for such inmates would require some five institutions for males and one for females.

As I indicated in my earlier Memorandum Opinion, the difficulty and expense involved in providing complete segregation of youth offenders from all other inmates are not legal justifications for the failure to perform the duty which the Congress made explicit. The qualifying phrase "insofar as practicable" [sic] is limited to the unusual and unforeseen circumstances required for particular inmates or groups of inmates as indicated in *Brown v. Carlson*, 431 F.Supp. 755 (W.D.Wis. 1977). Accordingly, it must be concluded that the plan is inadequate with respect to segregation.

The court directed that the defendants proceed to implement the plan, and further directed that the petitioners be placed in a facility designed and operated so as to separate them from non-YCA inmates.

The Bureau of Prisons defendants moved for an amendment of the judgment on the ground that total segregation and implementation of the plan at Englewood would be mutually inconsistent. If total segregation were achieved, implementation of the plan would be unnecessary. The Bureau further argued that whether petitioners should be segregated at Englewood, or elsewhere, remained within the Bureau's discretion. On February 5, 1980 the trial court amended its judgment; by declaratory judgment, the court indicated that the plan submitted by the Bureau was in compliance with the YCA, except with regard to failure to provide for total segregation of YCA inmates. The court reaffirmed its order requiring segregation of petitioners within ninety days.

## V.

### Issues on Appeal

The Bureau has appealed only that portion of the trial court's order which required complete segregation of the offenders. On May 5, 1980, the respondents moved for a stay of the trial court's order pending appeal; this motion was denied May 20th. The Bureau of Prisons apparently concedes that YCA inmates must, at a minimum, receive classification and segregated treatment programs as called for in the plan submitted to the trial court. However, the plan has not been implemented, pending disposition of the present appeal.

■ The question before this court is to what extent does the YCA require segregation of YCA offenders from non-YCA offenders?

The trial court was of the view that segregation is mandated by the Act except in unusual and unforeseen circumstances. Appellants concede that 18 U.S.C. § 5011 makes segregation of YCA offenders the norm. The Bureau argues, however, that the qualifying phrase "insofar as practical" grants the Bureau discretion to place YCA offenders in unsegregated institutions and permits mixing of inmates outside residential units and treatment programs as a matter of standard operating procedure. In light of the language of the statute and the legislative history, we disagree with such an interpretation of the statute.

First, the language of the statute itself, and particularly § 5011, is to the contrary. *See, Lewis v. United States*, 445 U.S. 55, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980); *Busic v. United States*, 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980). The first sentence of § 5011 provides that committed youth offenders are to undergo treatment in various types of facilities, including maximum, medium and minimum security institutions. The second sentence directs that institutions and agencies are to be designated, set aside and adapted for such treatment. The third sentence reads:

"Insofar as practical, such institutions and agencies are to be used only for treatment of committed youth offenders, and such youth offenders shall be segregated from other offenders, and classes of committed youth offenders shall be segregated according to their needs for treatment."

The Bureau relies upon this third sentence for the proposition that its plan for partial segregation of youth offenders complies with the YCA.

Before we undertake to construe the phrase "insofar as practical", we will consider the question of the proper interpretation of the third sentence of § 5011. This sentence permits the use of the same facility for YCA and adult offenders, provided that segregation is not "practical." One court has held that the third sentence of § 5011 allows the Bureau to deviate from complete segregation *only* with regard to use of a single facility for adults and youth offenders; segregation of youth offenders from other offenders within institutions has been held to be mandatory in all cases. *United States ex rel. Dancy v. Arnold*, 572 F.2d 107 (3rd Cir. 1978). There the court was of the view that the phrase "insofar as practical" modifies only the first clause of the sentence, leaving the requirement that youth offenders shall be segregated from other offenders absolute and unaffected by considerations of practicality.[3] Two courts have reached a different result from that in *Dancy. Brown v. Carlson*, 431 F.Supp. 755 (W.D.Wis.1977); *Johnson v. Bell*, 487 F.Supp. 977 (E.D.Mich.1980). The *Brown* court concluded that "insofar as practical" qualifies both the first and second clauses of the third sentence of § 5011. The court in *Brown* clarified its position by saying that:

[I]f and when it is not practical to house one or more YCA offenders in an institution or agency used only for the treatment of YCA offenders, and the YCA offender or YCA offenders are housed with non-YCA offenders, then, insofar as practical, the two categories of offenders are to be segregated from one another within the institution or agency in which they both are housed.

The *Brown* court also makes it clear that any deviation from the norm of segregation may occur only "occasionally, in the presence of unusual and unforeseen circumstances, and only for so long as necessary." 431 F.Supp. at 773. *Brown* decided that the Bureau retained some discretion with regard to both segregation of institutions and segregation within institutions. This conclusion was based on consideration of unusual situations which might arise. As an example of possible permissible use of mixed institutions, the court noted that a special training program involving unusually expensive equipment and specialized instructors might require use of a single facility by YCA and non-YCA offenders. Moreover, while segregation of training classes within the facility might not be practical, the statute would require segregation at all other times to the extent practical. Another possibility mentioned by the *Brown* court was a semi-permanent exception to the use of segregated institutions. Where a consistently small number of YCA offenders require housing in a particular type institution, such as a *maximum security facility*, the Bureau would be allowed to place YCA offenders in such an institution with other offenders, provided that the YCA offenders are separated from other offenders within the institution "insofar as practical."

The question of whether the *Dancy* or the *Brown/Johnson* interpretation is correct is not free from doubt. The *Dancy* court relied on a statement in the legislative history which reads:

The Director is required to designate, set aside and adapt institutions and agencies under the control of the Department of Justice for treatment. Such institutions and agencies are to be used only for the treatment of youth offenders, so far as

---

**3.** Although not expressly considered by the *Dancy* court, the rationale indicates that the duty to segregate youth offenders according to their treatment needs would also be viewed as mandatory by that court.

practicable; and youth offenders are to be segregated from other offenders, and the classes of offenders are to be segregated according to their needs for treatment. 1950 U.S.Code Cong.Service, 3983, 3986.

However, the phraseology used in the statute itself does not mirror the above language. Usage and ordinary understanding indicates that the phrase "insofar as practical" modifies all of the succeeding clauses of the sentence.[4] Furthermore, such an interpretation appears to be more desirable and allows the Bureau some reasonable, limited discretion to deviate from the norm of segregation within institutions, permitting responses to the unusual types of situations as identified by the court in *Brown*. Concededly, it would be unfortunate if the Bureau was precluded from placing YCA offenders in a special training program offered only at a single facility because complete segregation from other inmates could not be achieved. We are not going to give the Act such an extreme interpretation. As we read § 5011, the Bureau has some discretion, although limited, to deviate slightly from the norm of segregation with respect to placement of inmates in non-segregated institutions and with respect to segregation of inmates within institutions.

Acknowledging that the Bureau has some discretion, albeit slight, regarding segregation of youth offenders does not end our inquiry. The Bureau argues here that this discretion permits abandonment of any effort to maintain separate YCA facilities based on the Bureau's determination that administrative considerations and correctional goals indicate that separate facilities are impractical. Again we have to reject this view of the statute.

The language of the statute clearly contemplates a whole range of institutions which are to be designated, set aside and adapted for treatment of youth offenders.

The duty to so designate, set aside and adapt facilities is not qualified by any considerations of practicality. As we have noted, the legislative history would indicate that Congress relied on the experience in England with the Borstal System, a system which in 1950 embraced some thirteen institutions of varying security levels and with differing programs of rehabilitation. It may have been the intention of Congress that the development of the system of youth facilities would take place gradually. It is now thirty years since the YCA was enacted. The record shows that not one institution is presently designated, set aside or adapted for YCA offenders. There is no alternative but to hold that this situation is completely out of harmony with the statute and the legislative history. The very first step in the treatment program for youth offenders is set forth in the statute. It directs that institutions shall be set aside for youth offenders. It is only within the context of a comprehensive system of institutions and agencies devoted to youth offenders that any deviation from the norm would be tolerated.

Unquestionably segregation of youth offenders was a key element of the rehabilitation program which was envisioned by Congress when it enacted the YCA.

An integral part of the treatment program was the segregation of committed persons, insofar as practical, so as to place them with those similarly committed, to avoid the influence of association with the more hardened inmates serving traditional sentences. *Dorszynski v. United States, supra* [418 U.S.] at 434 [94 S.Ct. at 3048]. *See also, Durst v. United States,* 434 U.S. 542 [98 S.Ct. 849, 55 L.Ed.2d 14] (1978).

Courts which have faced challenges to YCA sentences which are potentially longer than comparable adult sentences have re-

---

4. Like the other courts which have addressed these questions, we are not here confronted with interpretation of the requirement that youth offenders be segregated among themselves according to their needs for treatment. However, our interpretation of the statute clearly indicates that some deviation from the norm of such segregation would be permitted. We decline to speculate regarding the special circumstances under which such an exception might be made.

peatedly emphasized the treatment which is afforded to the youth offender who is committed under the Act. *Rogers v. United States*, 326 F.2d 56 (10th Cir. 1963); *Harvin v. United States*, 445 F.2d 675 (D.C.Cir.), cert. denied, 404 U.S. 943, 92 S.Ct. 292, 30 L.Ed.2d 257 (1971); *Suggs v. Daggett*, 522 F.2d 396 (10th Cir. 1975). In an oft-quoted passage, the Chief Justice of the Supreme Court, who was then Judge Warren E. Burger, observed:

> [T]he basic theory of the [YCA] is rehabilitative and in a sense this rehabilitation may be regarded as the *quid pro quo* for a longer confinement but under different conditions and terms than a defendant would undergo in an ordinary prison.... [T]he YCA "provides for and affords youthful offenders, in the discretion of the judge, not heavier penalties and punishment than are imposed upon adult offenders, but the opportunity to escape from the physical and psychological shocks and traumas attendant upon serving an ordinary penal sentence while obtaining the benefits of corrective treatment, looking to rehabilitation and social redemption and restoration." *Carter v. United States*, 306 F.2d 283, 285 (D.C.Cir. 1962), quoting *Cunningham v. United States*, 256 F.2d 467, 472 (5th Cir. 1958).

Where YCA offenders are not given special treatment in accordance with the law but instead have the same terms and conditions of confinement as other offenders, the imposition of a sentence which tends to be longer on youth offenders raises a potential stumbling block of constitutional dimension. *United States v. Lowery*, 484 F.2d 457 (3rd Cir. 1973); *United States v. Torun*, 537 F.2d 661 (2nd Cir. 1976); *cf., United States ex rel. Sero v. Preiser*, 506 F.2d 1115 (2nd Cir. 1974), cert. denied 421 U.S. 921, 95 S.Ct. 1587, 43 L.Ed.2d 789 (1975) (New York law).

We are not suggesting that total segregation of YCA inmates must be maintained at all times and under all circumstances as a constitutional matter. Nor are we suggesting that the Bureau of Prisons' hands are tied from extending rehabilitative programs to non-YCA inmates. All such efforts by the Bureau, regardless of the na-

ture of the inmates' sentences, are commendable and are to be encouraged. We do say that segregation of youth offenders is directly related to and intertwined with the rehabilitative objective of the YCA. We have previously noted that the legislative history makes it clear that Congress viewed separation of youth offenders from older, more sophisticated inmates as the crucial initial step in preventing transformation of the youths into hardened criminals. We note, as well, that the record in this case suggests that provision of programs geared to youth offenders is in fact facilitated by placing youths in separate institutions. Testimony indicated that the programs at Englewood have changed in recent years to meet the needs of an older population. This situation is out of harmony with the Congressional intent that agencies and institutions should specialize in treatment of YCA offenders and provide rehabilitation programs which are geared to the needs of YCA offenders.

■ The Bureau of Prisons has argued that an interpretation of a statute by the agency charged with administering it is entitled to be followed unless clearly wrong. *E. g., Red Lion Broadcasting Co., Inc. v. Federal Communications Comm.*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969); *Brennan v. Occupational Safety & Health Comm.*, 513 F.2d 553 (10th Cir. 1975). Furthermore, the Bureau points out that courts must give proper regard to the Bureau's expertise and discretion in addressing concerns of penal administration. *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). However, the Bureau of Prisons does not have a blank check. It is required to follow the directions that have been laid down by Congress and if there is to be a change in the law, Congress should make the change. Deference to administrative interpretations is inappropriate where the result is clearly inconsistent with Congressional intent. *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973); *United States ex rel. Dancy v. Ar-*

*nold, supra.* We must assume that the legislative purpose is set forth in the clear language of the statute. We have to give the statute such construction as will achieve the express intent of the legislature. *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Kokoszka v. Belford,* 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974). In the light, then, of the express terms of the statutes in question, and considering the nature and character and program of the Youth Corrections Act, we are of the opinion that the Bureau's interpretation is contrary to the express language and also to the purpose and spirit of the Act.

■ In our view, the YCA requires the Bureau of Prisons to establish complete segregation of youth offenders from other offenders as the norm. The statute directs the Bureau in no uncertain terms to designate, set aside and adapt institutions for treatment of youth offenders. Only within this framework, in which complete segregation of youth offenders is the usual practice, may occasional aberrations be allowed for reasons of practicality. We are not in a position to define any such exceptions at this time, but such situations are going to arise from time to time and if they are within the context of substantial compliance with the segregation requirements of the YCA, they will pass muster. But it cannot be argued that such compliance does not exist at present. It is clear that the statute does not grant the Bureau discretion to determine that the entire legislative scheme of separate youth institutions is impractical. Discretion granted in § 5011 is limited by the specific directives of that section and by the overall scheme of classification and treatment called for in the YCA. The Director's discretion regarding placement and transfer of YCA offenders, 18 U.S.C. § 5015, is similarly limited. The Bureau's reasons for abandonment of segregated facilities and for partial abandonment of segregation within facilities can only be addressed to Congress. The Bureau has apparently concluded that the YCA approach is not the best way to handle offenders. But the Act and the legislative history

are not to be ignored. These documents make it clear that Congress was convinced that segregation of youth offenders and earnest efforts to rehabilitate them would pay tremendous social dividends.

In abandoning efforts to segregate youth offenders, the Bureau has substituted its judgment regarding desirable correctional objectives for the judgment of Congress. It may indeed be desirable to place committed offenders near to home and family; it may be possible to achieve this goal, at least in part, by designation of an adequate number of youth facilities. In any event, Congress placed primary importance on insulation of youth offenders from the corrupting influence of older offenders and on rehabilitation of youth offenders. Indeed, Congress specifically authorized and directed the Bureau to deal with the problem of mixing of various types of youth offenders by designating a variety of institutions for their treatment and by segregating them according to their needs for treatment. The Bureau of Prisons contends that the experiments which it has carried out demonstrate that the mixing of older and younger offenders may serve to reduce violence, but this is insufficient to justify disregard of a Congressional mandate. It is, of course, desirable to reduce violence but Congress is going to have to be convinced that this is a product of integration of hardened criminals with youth offenders. We do not deny the desirability of reducing violence. An institution cannot be successful unless this primary objective is achieved. The question is whether this cannot be accomplished through other means. The United States should not have to rely on inmates for maintaining discipline. Be that as it may, the Bureau is not free to reject the congressional plan. Acts of Congress cannot be avoided by administrative fiat.

The majority of the courts which have dealt with this issue reached results similar to ours. *United States ex rel. Dancy v. Arnold, supra; Brown v. Carlson, supra; Johnson v. Bell, supra; Watts v. Hadden,* 469 F.Supp. 223 (D.Colo.1979). *See also,*

*Robinson v. Ralston*, 642 F.2d 1077 (7th Cir. 1981); *United States v. Howard*, 449 F.2d 1086 (D.C.Cir.1971); *Micklus v. Carlson*, 632 F.2d 227 (3rd Cir. 1980). It is true that a few courts have reached apparently contrary results without discussion of the question of segregation. *Abernathy v. United States*, 418 F.2d 288 (5th Cir. 1969) (YCA offender may be placed in a maximum security institution); *Foote v. United States*, 306 F.Supp. 627 (D.Nev.1969) (YCA offenders may be placed in institutions with "hardened criminals"). Only one court has expressly addressed the segregation requirements of the YCA and concluded that those requirements need not be implemented by the Bureau of Prisons. *Outing v. Bell*, 632 F.2d 1144 (4th Cir. 1980). There, the court held that segregation of youth offenders is not mandatory under the YCA, and that a YCA sentenced prisoner must prove that segregation is practical before any relief is appropriate. A strong dissent was written in *Outing* by Circuit Judge K. K. Hall; needless to say we agree with the views expressed by Judge Hall. We have considered the rationale of the majority in *Outing* and we are not persuaded.

For the reasons that are set forth above, it is our conclusion that the judgment of the trial court should be and the same is affirmed. We remand the case for further proceedings in accordance with this opinion.

## PART II

This class action involves the second of two consolidated actions against the Bureau of Prisons and the United States Parole Commission. The two claims were filed as petitions for writs of habeas corpus pursuant to 28 U.S.C. § 2241, *et seq.*, by inmates of the Federal Correctional Institute at Englewood, Colorado. These inmates were sentenced under the Youth Corrections Act, 18 U.S.C. § 5005, *et seq.* The claim in this case is that the petitioners are being held unlawfully because the Parole Commission refused to follow the requirements of the Youth Corrections Act. The trial court entered a Partial Final Judgment under Fed. R.Civ.P. Rule 54(b) against the Bureau of Prisons. The appeal of that final judgment is dealt with in our previous opinion. This part deals only with the claim against the United States Parole Commission.

The trial court ordered the Parole Commission to file a written statement with the court setting forth the release date which had been determined for each of the original petitioners in this action; an explanation of the procedures by which that release date was determined; a statement of the manner in which the parole guidelines were applied when reaching that decision; a statement setting forth what, if any, information not contained in the pre-sentence report or in communications from the sentencing judge was used in making that determination; a statement of what re-examination was to be made of each of the original petitioners and when such re-examination was to be made; and what recommendations were received from the Director of Prisons with regard to each of the original petitioners.

The Parole Commission's response to the order was submitted on October 10, 1979. On January 30, 1980 the Parole Commission moved to dismiss the petitions of those of the original petitioners who had been released from confinement as being moot. Therefore, on May 20, 1980 the trial court ordered that this proceeding be conducted as a class action due to the possibility that mootness might permit these issues to escape review. Following certification of the class, the trial court entered an order which directed the Parole Commission to take action within 90 days to correct its arbitrary and capricious action in failing to comply with the mandatory provisions of the YCA. Final judgment to that effect was entered by the trial court against the Parole Commission on August 15, 1980. In its decree the trial court ordered the Parole Commission to remedy the following problems:

1. The failure to obtain and use for each committed youth offender a complete classification study, including a mental and physical examination of the type explicitly required by 18 U.S.C. § 5014, and as described in the plan for implementa-

tion submitted by the Bureau of Prisons on August 31, 1979.

2. The failure to consider the inmate's response to treatment programs and the use of guidelines which consider only the relative severity of past criminal conduct in determining the time for conditional release.

3. The failure to obtain and use periodic examinations and reports as required by 18 U.S.C. § 5016. The present practice of conducting an initial hearing with approximately three months of confinement and then deferring further consideration until the statutory time of 18 months or 24 months as required for adult offenders under 18 U.S.C. § 4208(h), is inadequate and not in compliance with the requirements of the YCA. While the YCA does not contain specific time limitations, provision for periodic reports in the Bureau of Prisons plan submitted on August 31, 1979 is sufficient and a review of the inmate's institutional progress on a corresponding schedule would meet the statutory requirements imposed on the Parole Commission as well.

4. The failure to consider the unconditional discharge of a youth offender at the expiration of one year from the date of conditional release as authorized by 18 U.S.C. § 5017(b). The commissioner's requirement of two years of "clean supervision" after conditional release is an improper application of the provisions of 18 U.S.C. § 4211(b). That section applies only to adult sentences. It is inconsistent with the YCA. *See Bellizi v. Kaslow*, 484 F.Supp. 868 (D.Colo.1980).

The Parole Commission has appealed the final judgment and order on two grounds:

First, the Commission questions whether it is required under the YCA to consider the youth offenders response to treatment when determining his eligibility for parole.

Second, the Commission questions whether it must consider the youth offender for unconditional release at the expiration of one year of parole under 18 U.S.C. § 5017(b).

The contention of the appellees, plaintiffs below, are:

1. That the Parole Commission's application of release guidelines to Youth Act sentences has the effect of converting judicially imposed indeterminate sentences into fixed and determinate terms of confinement, which practice invades the sentencing province of the courts.

2. The Parole Commission has abused its discretion in failing to conduct periodic examinations and consider unconditional release at the expiration of one year from the date of conditional release.

So, then, the issues to be determined are first, whether the Parole Commission is in violation of the Youth Corrections Act by reason of its interpretation of that Act in effect modifying and determining its meaning so as to revise its provisions and objectives. Second, has the Parole Commission acted invalidly in failing to conduct periodic examinations and in failing to consider unconditional release at the expiration of one year from the date of conditional release.

## I. *Background*

The legislative history of the Youth Corrections Act states that the purpose of the Act is to promote the rehabilitation of those youths who the sentencing judge believes show promise of becoming useful citizens. H.R.Rep.No.2979, 81st Cong., 2nd Sess., reprinted in [1950] U.S.Code Cong.Service, 3983. To that end, the Act was designed to make available, for the discretionary use of federal judges, an alternate sentencing and treatment procedure for those who, in the court's opinion, are qualified youth offenders. *Id.* The Act focuses on special, segregated treatment and supervision of youth offenders. The objective of the Youth Corrections Act was to substitute rehabilitative principles for retributive methods of treating antisocial behavior. *Id.*, p. 3985.[1] The impetus for the Act as originally adopted

---

1. For a general outline of the purposes and policies of the YCA see this court's opinion in that portion of these consolidated cases involv-

ing the claim against the U. S. Bureau of Prisons. Part I, *Watts v. Hadden*, at 1356.

was a study of the English Borstal system of rehabilitating youth offenders; the legislative history of the Act includes a thorough three-page discussion of that system and an analysis of how and why the system works. *Id.*, pp. 3987–89.

The view of Congress was that the special parole procedures within the Borstal system were crucial to the success of that system. *Id.*, pp. 3988–89. Originally, therefore, a Youth Corrections Division was created under the United States Board of Parole to carry out the purpose of the Act. 18 U.S.C. § 5005 (1950). In 1976, however, the nine member United States Parole Commission was established as an independent agency within the Department of Justice, which replaced the United States Board of Parole. 18 U.S.C. §§ 4201–4212 (1976). (The Parole Commission and Reorganization Act.) The Parole Commission, thus, replaced the Youth Corrections Division, and assumed the latter's responsibility for carrying out the purposes of the YCA. At this time § 5017 of the Youth Corrections Act was changed as follows: Prior to the 1976 amendment § 5017(a) stated that:

> The Division may at any time after reasonable notice release conditionally under supervision a committed youth offender. When, in the judgment of the Director, a committed youth offender should be released conditionally under supervision, he shall so report and recommend to the Division.

In 1976, § 5017(a) was amended to read as follows:

> The Commission may at any time after reasonable notice to the Director release conditionally under supervision a committed youth offender in accordance with the provisions of § 4206 of this Title. When in the judgment of the Director, a committed youth offender should be released conditionally under supervision, he shall so report and recommend to the Commission.

Section 4206 of 18 U.S.C., referred to above, lists the criteria that are to be considered by the Parole Commission when determining when to release a prisoner on parole. That section provides as follows:

(a) If an eligible prisoner has substantially observed the rules of the institution or institutions to which he has been confined, and if the Commission, upon consideration of the nature and circumstances of the offense and the history and characteristics of the prisoner, determines:

(1) that release would not depreciate the seriousness of his offense or promote disrespect for the law; and

(2) that release would not jeopardize the public welfare; subject to the provisions of subsections (b) and (c) of this section, and pursuant to guidelines promulgated by the Commission pursuant to section 4203(a)(1), such prisoner shall be released.

(b) The Commission shall furnish the eligible prisoner with a written notice of its determination not later than twenty-one days, excluding holidays, after the date of the parole determination proceeding. If parole is denied such notice shall state with particularity the reasons for such denial.

(c) The Commission may grant or deny release on parole notwithstanding the guidelines referred to in subsection (a) of this section if it determines there is good cause for so doing: PROVIDED, That the prisoner is furnished written notice stating with particularity the reasons for its determination, including a summary of the information relied upon.

(d) Any prisoner, serving a sentence of five years or longer, who is not earlier released under this section or any other applicable provision of law, shall be released on parole after having served two-thirds of each consecutive term or terms, or after serving thirty years of each consecutive term or terms of more than forty-five years including any life term, whichever is earlier: PROVIDED, HOWEVER, That the Commission shall not release such prisoner if it determines that he has seriously or frequently violated institution rules and regulations or that there is a reasonable probability that he

will commit any federal, state, or local crime.

Added Pub.L. 94–233, § 2, Mar. 15, 1976, 90 Stat. 223.

## II.

Under the 1976 amendments to 18 U.S.C., the Commission has the power to grant or deny an application or recommendation to parole any eligible prisoner. § 4203(b). A prisoner is eligible for release on parole after serving one-third of his term "except to the extent otherwise provided by law." § 4205(a). The Parole Commission is required under § 4203(a)(1) to promulgate rules and regulations establishing guidelines for the exercise of its enumerated powers. It has gone forward and has promulgated such guidelines for national parole policy. *See* 28 CFR § 2.1, *et seq.* It has issued instructions for the use of those guidelines in its Guideline Application Manual. Pursuant to those guidelines and instruction manual, the Parole Commission considers the following factors when determining whether, and when, to parole a youth offender:

(1) The Offense Severity Rating: Each prisoner is assigned a rating based on the severity of the offense for which he was convicted. Part III of the Guideline Application Manual states that the offense severity rating is to reflect the overall circumstances of the present offense behavior. The offense rating appropriate to the actual offense behavior that occurred is to be selected. If the actual offense behavior was more severe than the offense of conviction, the severity rating must be explained by a brief summary of the specific facts that justify the ratings.

As stated in the Manual:

> Example: Where the offense of conviction is bank larceny, and the actual offense behavior is bank robbery, the Notice of Action would read: 'Your offense has been rated as very High severity because you in fact used a threatening note to rob a savings and loan association.'

Any information in the file which is persuasive, in that such information comes from a reliable source and is corroborated by established facts, is to be used when determining the actual offense behavior/severity. Expressly cited as an example of such information is information contained in a count of an indictment that was dismissed as a result of a plea agreement.

An offense behavior which is not listed on the guidelines is to be rated by comparison with those offenses which are listed. Further, the manual provides that if an offense behavior can be classified in more than one severity category, the more serious category is to be used.

(2) The Salient Factor Score: There is a salient factor score which is given to each prisoner based on considerations of seven elements. The higher the salient factor score, the earlier the inmate will be entitled to parole. Those factors which are individually scored to comprise the total salient factor score include:

(a) Previous instances of criminal conduct (including juvenile or youth adjudications);

(b) Prior incarcerations (including commitment to juvenile institutions and residential treatment centers);

(c) Age at first commitment (under this factor younger offenders are penalized and given a less positive parole prognosis. An inmate 26 years of age or older at the time of his first commitment receives two points; an inmate between 18 and 25 years of age at the time of his first commitment receives one point; an inmate 17 years of age or younger at the time of his first commitment receives zero points);

(d) Whether the offense involved auto theft;

(e) The inmate's prior or present parole history;

(f) Whether the inmate has a history of heroin or opiate dependence; and

(g) Whether the inmate was employed or a full time student for a total of at least six months during his last two years in the community.

The two scores, offense severity and salient factor, are the same ingredients used by the Parole Commission to evaluate the parole prognosis of adult offenders, and are considered together when determining when a youth offender is entitled to be paroled. Guidelines are followed which state the length of time the inmate must serve in custody prior to parole in accordance with the inmate's particular scores.

In about ten percent of all cases, however, mitigating circumstances may cause the Commission to require the inmate to spend less time in custody before he is entitled to parole. Mitigating factors which may be considered include diminished mental capacity; duress; evidence of the prisoners attempted withdrawal prior to completion of the offense; a belief by the prisoner that he had a claim of right to the property (where property offenses are involved); a determination that a prisoner is a better parole risk than his salient factor score indicates because, for example, he has extremely strong community resources available or he had not engaged in criminal behavior for a substantial amount of time since his last offense; the fact that the prisoner had provided substantial cooperation to the government in prosecuting other cases; a prisoner's poor medical prognosis; the fact that a prisoner has served a substantial continuing period of his time in custody on other charges; the fact that the prisoner faces a substantial period of time in custody on additional sentences; and a determination that the prisoner has made a record of clearly exceptional institutional program achievement over a substantial period of time. Regarding the latter factor the Manual notes:

A clear conduct record and good program achievement is expected. This is reserved for cases in which the prisoner's record of program achievement is clearly

exceptional, and should be supported by the hearing summary.

In the absence of such mitigating factors, the guidelines are followed when the Commission determines the length of time which the inmate must serve in custody prior to being conditionally released on parole.[2] These release guidelines are now to be applied to any offender sentenced under either Youth Corrections Act, the Narcotic Rehabilitation Addict Act or the Juvenile Justice Act, and to any other offender who was less than 22 years of age at the time he committed the offense for which he was convicted, regardless of the type of such a defendant's sentence. 28 CFR § 2.20(h)(2) (1980).

The Parole Commission's practice has been to interpret § 4205(a), which provides that a prisoner is eligible for release on parole after serving one-third of his term except to the extent otherwise provided by law, as meaning that Youth Corrections offenders committed for the minimum six year indeterminate sentence are eligible for parole after being in custody for two years.

The Commission has applied the provisions of § 4211(b) to cases involving YCA offenders. Section 4211 provides:

(b) Two years after each parolee's release on parole, and at annually thereafter, the Commission shall review the status of the parolee to determine the need for continued supervision. In calculating such two-year period there shall not be included any period of release on parole prior to the most recent such release, nor any period served in confinement on any other sentence.

Thus, the Commission has generally required youth offenders to serve two years of "clean parole supervision" before being considered for unconditional discharge. In regulations published in 45 Fed.Reg., No. 179, pp. 60427–60428 (1980), the Commission

---

**2.** Another ten percent of inmates are required by the Parole Commission to remain in custody for longer than the period required by the guidelines, however, because of factors directly opposite to those considered to be mitigating circumstances. Such factors include reasons related to aggravated offenses, factors relating to a poorer parole prognosis, and factors which cause certain inmates to be considered greater parole risks. In such cases, as in cases where mitigating factors are found, the guidelines are not followed. Therefore, the guidelines are followed in approximately 80% of all cases.

states that it is "formally adopting" the aforementioned means of determining how long a prisoner released on parole should remain under parole supervision before such supervision is normally terminated.

### III.

*Pertinent Provisions of the Youth Corrections Act*

■ We now turn to the policies and procedures which are outlined in the Youth Corrections Act. A trial judge must first determine whether to sentence a qualifying youth under the Youth Corrections Act, or under statutes prescribing the crime for which he was convicted, which provide for adult sentences of a determinate nature. To sentence the youth offender under regular, determinate adult provisions, the trial court must first find that the defendant would not benefit by treatment and supervision under the indeterminate sentencing provisions of the Youth Corrections Act. *Dorszynski v. United States*, 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974). If the trial court does not conclude that the defendant would not benefit from the sentencing provisions of the Youth Corrections Act, then the court *must* sentence the defendant under the provisions of that Act.

Following a determination that the defendant is to be sentenced under the Act, the court has three options:

First, it may determine that there is no need for commitment, and suspend the imposition or execution of sentence and place the defendant on probation. 18 U.S.C. § 5010(a).

Second, in lieu of the penalty of imprisonment otherwise provided by law, the court may sentence the defendant to the custody of the Attorney General for treatment and supervision until discharged by the Parole Commission under the provisions of 18 U.S.C. § 5017(c). 18 U.S.C. § 5010(b).

Third, if the court finds the defendant may not derive maximum benefit from treatment prior to the expiration of six years from the date of conviction, the court may sentence the defendant to the custody of the Attorney General for treatment and supervision for any period authorized by law for the offense of conviction, or until discharged by the Parole Commission under the provisions of 18 U.S.C. § 5017. 18 U.S.C. § 5010(c).

If the youth offender is sentenced under either the second or third options above, that is §§ 5010(b) or (c), his commitment is for an indeterminate period not to exceed six years (subsection (b)), or for an additional indeterminate period of not longer than that which could have been imposed for the substantive offense (subsection (c)). Once the court decides to commit the defendant under either subsection (b) or (c) of the Youth Corrections Act, rather than suspending the sentence and placing the defendant on probation under subsection (a), the court has no discretion to impose a lesser detention period than the indeterminate six year term.

■ Although when committing a defendant to custody under an adult sentence the court has the option of choosing a minimum sentence, when committing a defendant to custody under the Youth Corrections Act the court may only order an indeterminate sentence for six years or longer; the court has no option under the Youth Corrections Act to order a shorter period of commitment. This is true regardless of the regular adult term of imprisonment for which the defendant could have been committed, whether that term was 6 years or three months. Once the youth offender is so sentenced and committed to the custody of the Attorney General, the length of the time the defendant will actually spend in custody is determined solely by the Parole Commission. *See e. g., United States v. Jackson*, 550 F.2d 830, 832 (2nd Cir. 1977). To that end, Congress has provided standards to be followed by the Parole Commission when considering whether and when a youth offender should be paroled.

18 U.S.C. § 5014 requires that within thirty days of commitment a youth offender must be sent to a classification center which must make a complete study of the youth, including a physical and mental ex-

amination, "to ascertain his personality traits, his capabilities, pertinent circumstances of his school, family life, any previous delinquencies or criminal experiences, and any mental or physical defects or other facts contributing to his delinquency." A report of the center's findings are to be sent to the Parole Commission, and the youth is to receive a parole interview "as soon as practicable after commitment."

18 U.S.C. § 5016 states that the Director of the United States Bureau of Prisons shall make periodic examinations and re-examinations of all committed youth offenders and make reports to the Parole Commission.

18 U.S.C. § 5017(a) allows the Commission to conditionally release a youthful offender, under supervision, *at any time*, in accordance with the provisions of 18 U.S.C. § 4206. The latter section permits the Parole Commission to release an inmate on parole pursuant to the guidelines promulgated by the Commission to be followed when determining whether and when to parole a prisoner (subsection (a)), *or* for good cause (subsection (b)). Under subsection (b), therefore, the guidelines need not have been followed or complied with in order for the Commission to release a defendant for good cause. Further, the fact that supervised release need not be based on the guidelines established by the Commission to be followed when evaluating the status of an inmate is emphasized by § 5017(a), under which the Director of Prisons may recommend to the Commission at any time that the youth offender be released on parole. Moreover the Parole Commission's guidelines specifically state that a committed youth offender may be released on parole at any time in the discretion of the Commission. 28 CFR § 2.5 (1980).

Under § 5017(b) the Commission may discharge a committed youth offender unconditionally at the expiration of one year from the date of conditional release. Regulations for administering § 5017(b) provide that upon its own motion, or upon request of the parolee, the Commission may terminate supervision over a parolee, prior to the expiration of his maximum sentence, at any time after one year of continuous supervision on parole. 28 CFR 2.42(a)(1). When such early discharge occurs, the conviction upon which the sentence rests is automatically set aside. 18 U.S.C. § 5021(a). Additionally, the sentences of youth offenders who received an unconditional discharge from a sentence of probation prior to the expiration of their maximum sentence will also be set aside.[3]  18 U.S.C. § 5021(b).

Against this background we must, then, proceed to consider the conflicting contentions of the Parole Commission.

### IV.  *The Issues*

The Commission contends that it is not required to consider a YCA offender's response to treatment when determining his eligibility for parole, and that it is not required to routinely consider every youth offender for unconditional release at the expiration of one year of parole. The gist of the Commission's argument is that when Congress enacted the Parole Commission and Reorganization Act in 1976, it repealed the prior parole requirements to be followed when considering the parole eligibility of YCA offenders, and that it intended for the Commission to apply the same parole criteria to all prisoners, whether they were sentenced under the YCA or under any other statute, and whether they are youths or adults.

Most courts which have considered the Commission's policies of determining the

---

**3.** This circuit has recognized, by implication, that such "setting aside" of the conviction means that the conviction will be expunged from the defendant's records. *United States v. Bronson*, 449 F.2d 302 (10th Cir. 1971), *cert. denied*, 405 U.S. 994, 92 S.Ct. 1268, 31 L.Ed.2d 463 (1972). *See also, United States v. Wallulatum*, 600 F.2d 1261 (9th Cir. 1979); *Doe v. Webster*, 606 F.2d 1226 (D.C.Cir.1979); and *Mestre Morera v. United States Immigration*

*and Naturalization Service*, 462 F.2d 1030 (1st Cir. 1972) where the courts held that when Congress determined that the offender's conviction was to be "set aside," Congress intended that the conviction be expunged from the offender's records. Compare *United States v. Doe*, 556 F.2d 391 (6th Cir. 1977) and *United States v. McMains*, 540 F.2d 387 (8th Cir. 1976), where the courts held that expunction of the offender's record was not warranted.

parole eligibility of YCA offenders are in agreement that the Commission's guidelines are out of harmony with the purpose behind the enactment of the Youth Corrections Act, which purpose was favorably recognized by the Supreme Court in *Dorszynski v. United States*, 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974). There the Court termed the Youth Corrections Act "the most comprehensive federal statute concerned with sentencing." 418 U.S. at 432, 94 S.Ct. at 3047. The Court recognized that the Youth Corrections Act was designed to rehabilitate youth offenders, and that federal judges were given sentencing alternatives under the Act to accomplish this objective. *Id.* at 433, 94 S.Ct. at 3048. Thus, the courts could depart from traditional sentencing patterns, and focus primarily on correction and rehabilitation of youth offenders. *Id.* Once a person was committed for treatment under the YCA, therefore, the Supreme Court acknowledged that "the execution of sentence was to fit the person, not the crime for which he was convicted," and that "the range of treatment available was made broad to provide maximum flexibility." *Id.* at 434, 94 S.Ct. at 3048. The Youth Corrections Division created under the Board of Parole, "in conjunction with the Bureau of Prisons and the Probation Service [was to operate to] . . . provide the unique features of the Acts' program." *Id.* Since the enactment of the Parole Commission Act in 1976, however, a number of courts have recognized that the Parole Commission has not followed, or fostered, the provisions or purposes of the YCA. *See e. g., United States v. Amidon*, 627 F.2d 1023 (9th Cir. 1980); *United States v. Wallulatum*, 600 F.2d 1261 (9th Cir. 1979); *United States v. Jackson*, 550 F.2d 830, 832, n. 6 (2nd Cir. 1977); *United States v. DiRusso*, 548 F.2d 372 (1st Cir. 1976); *United States v. Torun*, 537 F.2d 661 (2nd Cir. 1976); *United States v. Cruz*, 544 F.2d 1162 (2nd Cir. 1976); *Bellizzi v. Kaslow*, 484 F.Supp. 868 (D.Colo.1980); *Johnson v. Bell*, 487 F.Supp. 977 (E.D.Mich.1980); *Buckhannon v. Hambrick*, 487 F.Supp. 41 (S.D.N.Y. 1980); *Duldulao v. United States Parole Comm'n.*, 461 F.Supp. 1138 (S.D.Fla.1978).

In addition, the guidelines promulgated by the Parole Commission pursuant to 18 U.S.C. § 4206(a) (1976) are substantially the same as the guidelines enacted by the Commission in 1973 pursuant to 18 U.S.C. § 4203(a) (1970) (repealed 1976). Therefore, there are many cases in which youth offenders have challenged the Board of Parole's application of the 1973 guidelines to YCA offenders prior to the 1976 Act, where the courts found that the purposes of the Youth Corrections Act were being frustrated. *See e. g., United States ex rel. Mayet v. Sigler*, 403 F.Supp. 1243 (M.D.Pa.1975), aff'd. 556 F.2d 570 (3rd Cir. 1977); *United States v. Norcome*, 375 F.Supp. 270 (D.D.C. 1974), aff'd. 497 F.2d 686 (D.C.Cir.1974); *see also, Rifai v. United States Parole Commission*, 586 F.2d 695 (9th Cir. 1978), where the court recognized that both the 1973 and 1976 guidelines changed the emphasis on the criteria considered in determining parole release for YCA offenders from institutional performance to offense severity.

Some courts have held that since the parole guidelines have rendered offense severity, rather than institutional progress, the decisive factor in Youth Corrections Act parole release considerations, and thereby resulted in Youth Corrections offenders serving periods of additional imprisonment, that the parole guidelines could not be applied retroactively. These courts have held that YCA offenders sentenced prior to the 1976 amendments had to be considered for parole in accordance with the purposes of the Youth Corrections Act: that is, institutional progress must be considered when determining when and whether to parole YCA offenders sentenced prior to 1976. *See e. g., De Peralta v. Garrison*, 575 F.2d 749 (9th Cir. 1978); *White v. Warden*, 566 F.2d 57 (9th Cir. 1977). *See also, Benites v. United States Parole Commission*, 595 F.2d 518 (9th Cir. 1979), and *Shepard v. Taylor*, 556 F.2d 648 (2nd Cir. 1976), where the courts held that retroactive application of the guidelines would violate the ex-post facto clause. Contra, *Rifai v. United States Parole Commission, supra.*

The courts referred to have recognized that unless the Parole Commission considers

a Youth Corrections offender's response to treatment when determining that offender's eligibility for parole, the YCA is virtually being ignored. In *Duldulao v. United States, supra,* it was expressed that "[i]t is clear that sentences under the parole guidelines . . . were to fit the crime, not the person." 461 F.Supp. at 1142. The court in *United States v. Amidon, supra,* noted that the rehabilitation purposes of the Youth Corrections Act have been generally abandoned by the Bureau of Prisons and the Parole Commission, and that the Parole Commission uses the same guidelines for determining release dates of both adult and YCA offenders. 627 F.2d at 1026.

In *United States v. Wallulatum, supra,* the court stated that insofar as the parole guidelines consider the Youth Corrections Act offender's offense and not his rehabilitation as the primary criteria when determining the offender's parole eligibility, the guidelines "conflict with the YCA requirement that the seriousness of the offender's crime be 'conspicuously absent' for parole considerations." (citation omitted). 600 F.2d at 1263.

In *United States v. Jackson, supra,* the court noted that the Commission's apparent mechanical application of the parole guidelines to YCA offenders is "not only inconsistent with the purposes of the Act, but may also undermine the justification for the Acts' indeterminate sentencing provisions." 550 F.2d at 832.

The court in *United States v. Torun, supra,* recognized further that since the parole guidelines rely on criteria other than the YCA offender's individual rehabilitation in the institution, "they undermine a major justification for subjecting any youthful offender to a longer period of incarceration than an adult offender guilty of the same offense." 537 F.2d 664.

The frustration of the trial court in *Buckhannon v. Hambrick, supra,* was expressed in that court's opinion. There the trial court had sentenced the petitioner under the YCA. Following denial of parole, the petitioner sought relief from the Parole Commission's action from the trial court. The court, most reluctantly, held that it was without authority to grant relief to the petitioner. The court noted that it had sentenced the defendant under the YCA believing that the defendant desperately needed narcotics rehabilitation, and that once the defendant had been rehabilitated he would be paroled. The court stated that following the defendant's confinement the Parole Commission proceeded to "resentence" the defendant. Serious disagreement was expressed with the fact that the Parole Commission was no longer placing emphasis upon the youth offender's rehabilitation when deciding whether to parole such an offender. The court stated that "the district judges no longer truly sentence a defendant. The parole guidelines do." 487 F.Supp. at 43. The court found that this resentencing procedure was unfortunate, because the parole guidelines are arbitrary and discriminatory since, for example, in *Buckhannon,* the guideline time was doubled because of the number, rather than the nature of the bank robberies involved, whereas the trial court had concluded that the robberies should have been viewed as a chain of related events, and should have been treated by the Parole Commission as a single event for sentencing purposes. In addition, the court felt that the Parole Commission's guidelines failed to take into account the defendant's motive for the robberies, which was to feed his drug habit, which was the reason the trial court had sentenced the defendant under the YCA for rehabilitation.

It does appear that the Parole Commission's application of the guidelines to YCA offenders is plainly at odds with the purposes and policies of the YCA. Furthermore, it is an approach that is extremely rigid in that the Commission follows those guidelines no matter the fact situation. However, we will address each of the Commission's claims of error on a separate basis.

A. *Must the Parole Commission consider the individual rehabilitation/institutional progress of each YCA offender when determining his eligibility for parole?*

█ As we have previously noted, regardless of the length of time for which a

defendant may be confined under a determinate adult sentence for the offense committed, a defendant sentenced to confinement under the YCA must be sentenced to a minimum of six years indeterminate commitment. *See e. g., United States v. Jackson, supra; United States v. Cruz, supra.* No lesser sentence is allowed. This possible imposition of a longer sentence for a YCA offender has been repeatedly held constitutional and justifiable as a means of providing corrective and preventative guidance and training. 18 U.S.C. § 5006(f); *Rogers v. United States,* 326 F.2d 56 (10th Cir. 1963), wherein this court said:

> It is true, as appellant contends, the period of confinement for one sentenced under the Act may turn out to be greater than the maximum sentence provided for in the statute defining the crime charged. However, this does not mean that the punishment is greater, because *the confinement is for the purpose of rehabilitation by treatment and not for the purpose of punishment.* (emphasis added.)

326 F.2d at 57. See also, *United States v. Critchlow,* 459 F.2d 793 (10th Cir. 1972). Similarly, in *Carter v. United States,* 113 App.D.C. 123, 125, 306 F.2d 283, 285 (1962), Chief Justice Burger stated:

> The basic theory of the Act is rehabilitative and in a sense this rehabilitation may be required as compromising the *quid pro quo* for a longer confinement but under different conditions and terms than a defendant would undergo than an ordinary person.

The above rationale was followed by the Court in *United States ex rel. Dancy v. Arnold,* 572 F.2d 107, 110–111 (3rd Cir. 1978). See also, *Cunningham v. United States,* 256 F.2d 467, 472 (5th Cir. 1978).

■ Under the YCA, the entire goal is to release the youth offender from confinement once he or she has reached the point where rehabilitation has been realized and there has been an adjudication thereof. Therefore, a YCA offender may also be released earlier than he would be if he were evaluated under general parole statutes. *See United States v. Bronson,* 449 F.2d 302

(10th Cir. 1971), *cert. denied,* 405 U.S. 994, 92 S.Ct. 1268, 31 L.Ed.2d 463 (1972). This is a factor that is involved in the Youth Corrections Act which is sometimes overlooked, that is, the motivation to achieve rehabilitation so as to obtain release.

Also, for this same reason, YCA offenders who receive indeterminate sentences do not get "good time" allowances for parole purposes. *Staudmier v. United States,* 496 F.2d 1191 (10th Cir. 1974). Because the focus of the Youth Corrections Act is on rehabilitating the youth offender, and releasing him once he is rehabilitated, a youth offender sentenced under 18 U.S.C. § 5010(b) or (c) is eligible for conditional release at any time and no minimum sentence is required.

In unilaterally determining that a YCA offender is not eligible to be considered for parole until he has served a specified time in confinement, the Parole Commission has disregarded the indeterminate nature of the YCA sentencing procedure, and rendered the indeterminate sentence a determinate sentence. In so doing, the Parole Commission has assumed that it, rather than the trial court has the power to sentence under the YCA. This is contrary to the law expressly recognized in *Dorszynski v. United States, supra.* There the Supreme Court stated that "the intent of Congress [in enacting the YCA] was in accord with the long established authority in the United States vesting the sentencing function exclusively in the trial court." 418 U.S. at 440, 94 S.Ct. at 3051. The YCA "was meant to enlarge, not restrict, the sentencing option of federal trial courts ...." *Id.* at 436, 94 S.Ct. at 3049. In addition, by so acting the Commission has nullified the justification for mandating that YCA offenders be imprisoned for an indeterminate period of time for at least six years, regardless of the time for which the offender may be committed if he is sentenced under regular, adult statutes. This raises serious constitutional questions, concerning both the due process and equal protection rights of committed YCA offenders. Moreover, the provision of 18 U.S.C. § 5014, which mandates

that a YCA offender be given a parole interview as soon as practicable after commitment, becomes meaningless if the Commission is not going to consider the youth offender's release prior to the predetermined date set by the guidelines.

By providing that the same release guidelines for youth offenders are to be applied to not only them but to any youth sentenced under any other statute, even those as to whom the trial court found would not benefit under the Youth Corrections Act, 28 CFR § 2.20(h)(2) (1980), the Parole Commission has specifically taken upon itself the power to ignore the trial court's finding as to whether a defendant would benefit from the particular purposes and policies of the YCA.

Dr. Peter Hoffman, Research Director for the United States Parole Commission, acknowledged that the Commission does not expressly consider the YCA offender's response to treatment or the extent of his rehabilitation when evaluating the offender for parole. The trial court stated:

> Except in the most unusual circumstances, the inmate's response to rehabilitative treatment is ignored. Because satisfactory institutional conduct is assumed for all offenders, that core concept of the legislative mandate has been cut from parole consideration.

> Simply put, the United States Parole Commission has decided that all inmates who come within its jurisdiction should be subject to a determinate sentence. Accordingly, each inmate, early in confinement, is given a presumptive parole date indicating the expected time for release, assuming observance of the rules of the institution. Voluntary participation in educational, vocational and other program opportunities has little effect in determining the time to be spent in confinement.

469 F.Supp. at 230.

The Commission's brief zeros in on the fact that, in effect, the Commission disagrees with Congress' stated means of achieving the objectives of the Youth Corrections Act, and believes that offense sev-

erity, rather than the extent of the youth offender's rehabilitation, should be the determinative factor when considering a youth offender's eligibility for parole. The Commission's argument is based on its own policy judgments that fairness and rehabilitative progress require consideration of offense severity in making parole decisions, and that failure to consider offense severity leads to a disparity of prison terms for those offenders who have committed the same types of offenses, which in turn leads to a lack of confidence in the criminal justice system.

We express no opinion as to whether the philosophies of Congress or those of the Parole Commission constitute a better view. Our sole concern is with whether the Parole Commission, in uniformly applying its guidelines to YCA offenders, has complied with Congressional purposes and policies in enacting the Youth Corrections Act. We hold that the Commission has not done so.

The argument of the Commission is that the trial court misstated the facts when it found that institutional behavior did not influence the parole date set in the 80% of the cases where the guidelines are followed. [See note 2, *supra*.] The Commission alleges that the offenders' institutional performance, as assessed in periodic reviews, can dictate a change of months in the actual parole date of prisoners within the guidelines. The record does not show that such has been the policy of the Commission, however. The parole reports of the named party plaintiffs do not reflect that institutional progress of any of the offenders had resulted in a decrease in the amount of time that would be spent in confinement prior to release on parole in accordance with the guidelines, except in those cases where the stated mitigating circumstances were present. Further, Dr. Hoffman testified that the salient factor score sheet does not reflect any consideration of the rehabilitation of the youth offender at all. Dr. Hoffman testified that except in those 20% of the cases where the guidelines are not followed because of mitigating or aggregating circumstances, the extent of the YCA of-

fender's rehabilitation is not considered when determining his eligibility for parole. We cannot, therefore, agree with the Commission's contention that the trial court incorrectly stated the facts.

B. *Does the Youth Corrections Act require the Parole Commission to routinely consider every youth offender for unconditional release at the expiration of one year of parole?*

■ 18 U.S.C. § 5017(b) of the YCA authorizes the Parole Commission to grant a youth offender unconditional release from supervision after he has spent one year on parole. 28 CFR § 2.43(a)(1) provides that on its own motion, or at the request of the parolee, the Commission may terminate supervision "at any time after one year of continued parole." However, the Commission's regulations at 45 Fed.Reg. 60427–60428 state that the Commission is formally adopting its policy of requiring youth offenders given the most favorable parole prognosis by the Commission to serve two years of clean parole supervision before being considered for unconditional discharge, and youth offenders given less favorable parole prognosis to serve three years of difficulty-free supervision prior to being unconditionally released. In its brief the Parole Commission acknowledges that unconditional release is seldom granted after the youth offender has spent one year on parole since, in order to be so released, the Commission must determine that the offender is "a very good risk to avoid repeated offenses and that continuous supervision would be counterproductive."

The Commission's position is set forth in its brief as follows:

The Commission will *consider* the inmate for release at the point he becomes eligible (generally after serving one-third of his sentence, 18 U.S.C. 4205(a)). The Commission does not *grant* parole at that point, however, unless the inmate meets the guideline requirements, except where special circumstances warrant a departure from the guidelines. Likewise, the Commission will consider a youth offender for unconditional release at the end of one year on parole, but it will not ordinarily grant release until two years have been completed.

The Commission argues that under *United States v. Addonizio*, 442 U.S. 178, 188–89, 99 S.Ct. 2235, 2241–2242, 60 L.Ed.2d 805 (1979), the Parole Commission has complete discretion to determine when to grant unconditional release as opposed to when to consider unconditional release. We agree with the Commission's interpretation of *United States v. Addonizio*, but think that the Commission has improperly construed the meaning of the term "consider."

Under 18 U.S.C. § 5017(b), the Commission is permitted to use its discretion in determining whether to grant unconditional release of YCA offenders after they have served one year of parole. In order to exercise that discretion, serious consideration must be given to the circumstances of each individual case to determine whether each YCA offender should be unconditionally released. A unilateral, across the board decision to apply a two year period of supervision, except in extraordinary circumstances, because the Board has determined, after researching the issue, that such was the more valid policy, does not meet the test of "consideration." Again, the Board has made its *own* determination as to what *it* feels is the most valid policy to follow in treating YCA offenders and has completely ignored the policies prescribed by Congress when it enacted the YCA. This factor is acknowledged in the Commission's brief. P. 23–26.

■ The Commission has discretion to consider the facts in each YCA offender's case in the process of determining whether each individual YCA offender should be unconditionally paroled after one year. The Commission does not have the discretion to establish a uniform policy which holds that all YCA offenders will be considered for unconditional release after two years on parole, in direct contravention of the congressional mandate that individual consideration should be given with regard to each offender after he has spent one year on parole. As to the Commission's second

claim of error, therefore, as well as its first, we are constrained to hold that the trial court correctly held that the policies of the Commission were out of harmony with the policies established by Congress when it enacted the YCA.

Still another factor ought to be mentioned here. In following rigid guidelines, and in refusing to give more than a token consideration to the YCA offender's evaluation prior to setting his unconditional release date [at any time], the Parole Commission may be denying some YCA offenders, who would otherwise be entitled to release prior to expiration of the maximum sentence imposed if their institutional progress was seriously considered, the right to benefit from a particular purpose of the YCA. As previously noted, under 18 U.S.C. § 5021(a), if an offender committed under § 5010(b) or (c) of the YCA is unconditionally released before the expiration of the maximum sentence imposed, the YCA offender is automatically entitled to a certificate setting aside the commitment. As the Supreme Court stated in *Durst v. United States*, 434 U.S. 542, 548, 98 S.Ct. 849, 852, 55 L.Ed.2d 14 (1978), "[a] particularly valuable benefit for a YCA offender sentenced under the YCA is the prospect of obtaining a certificate setting aside his commitment." Similarly, the court in *United States v. Arrington*, 618 F.2d 1119, 1124 (5th Cir. 1980), took notice of the fact that the YCA's import is "to remove the taint of youthful indiscretions, giving a youthful offender a second chance to be free of the lifelong ignominy of a criminal record. [citations omitted.]" This policy may sometimes be circumvented by the Parole Commission's practice of rigidly applying its guidelines to cases involving YCA offenders.

C. *Does the enactment of the 1976 Parole Commission Act and its amendments to § 5017 of the Youth Corrections Act empower the Parole Commission to ignore the requirements and the standards contained in the Youth Corrections Act or repeal that Act by implication?*

The position of the Parole Commission is that when Congress adopted the new Act, the Parole Commission and Reorganization Act, 18 U.S.C. § 4201, *et seq.*, it explicitly provided under § 5017(a) that the same standards for parole should be applied to youth offenders and adult offenders. The argument is, that, by virtue of the 1976 amendments Congress has repealed the YCA insofar as it applies to parole decisions. The Commission maintains that in amending § 5017(a) to read that the Commission may release a YCA offender on parole in accordance with the provisions of 18 U.S.C. § 4206, that *only* the requirements of § 4206 need be complied with, and that the purposes and policies of the Youth Corrections Act are abolished. We have examined the Acts and we must disagree with this stand. Our holding is that the Commission must comply with the requirements of § 4206 and the requirements of the entire Youth Corrections Act as well.

First, what are the requirements of § 4206? Under that section, the Commission must determine that the inmate has substantially observed the rules of the institution to which he has been confined, that the inmate's release would not depreciate the seriousness of his offense or promote disrespect for the law, and that the inmate's release would not jeopardize the public welfare. If these findings are made, the inmate may be released pursuant to the Commission's guidelines (§ 4206(a)(2)), or for good cause, notwithstanding the guidelines under § 4206(c). The Commission argues that by enacting this section, Congress intended for YCA offenders to be considered for parole in the same manner as adult offenders, and, thus that the YCA need no longer be enforced.

The Second Circuit has agreed with the Commission's argument. It held in *Shepard v. Taylor, supra*, that in 1976 Congress revised its earlier parole concepts under the YCA, and "mandated consideration of hitherto prohibited factors of general deterrence and retribution in determining whether to parole (or reparole) individuals sentenced under the Youth Corrections

Act." 556 F.2d at 653. Other courts have also agreed with this argument.[4] We agree with the Parole Commission that in authorizing it to consider the offense severity of committed YCA offenders in determining eligibility for parole, Congress changed the procedure in that respect. But had Congress intended to overhaul the system, surely it would have said so. So, we have to conclude that the Commission's failure to consider the YCA offender's response to treatment, as required by that Act, to determine if there is "good cause" to release that Youth Corrections offender pursuant to § 4206(c) is wholly unwarranted, as is the Commission's failure to consider Youth Corrections Act offenders for unconditional release following one year parole pursuant to § 5017(b). *See e. g., Rifai v. United States Parole Commission,* 586 F.2d 695 (9th Cir. 1978); *Johnson v. Bell,* 487 F.Supp. 977 (E.D.Mich.1980). Additionally, in 1976 § 5005 of the Youth Corrections Act was amended to read as follows:

§ 5005. *Youth Correction decisions.*

The Commission and, where appropriate, its authorized representatives as provided in section 4203(c), may grant or deny any application or recommendation for conditional release, or modify or revoke any order of conditional release, of any person sentenced pursuant to this chapter, and perform such other duties and responsibilities as may be required by law. *Ex-*

*cept as otherwise provided,* decisions of the Commission shall be made in accordance with the procedures set out in chapter 311 of this title (emphasis supplied).

This section specifically provides that the procedures of Chapter 311 are to be followed *except as otherwise provided* by the YCA. The Youth Corrections Act has indeed otherwise provided that Youth Corrections offenders' response to treatment is to be a determinative factor when considering those inmates' eligibility for parole.

In the case of *Rifai v. United States Parole Commission, supra,* 586 F.2d at 698, 699, the Ninth Circuit has held that the 1976 Parole Act did not change the law governing parole release decisions, since when enacting the 1976 Act, Congress recognized that " '[t]he standards for release on parole . . . are not significantly changed from existing law.' Sen.Rep. No. 940369, 94th Cong., 2nd Sess. [1976] reprinted in 2 U.S.Code Cong. & Admin.News, 335, 339." The Ninth Circuit held that at most, the 1976 standards may have placed an emphasis on particular parole consideration; the 1976 Act did not abridge the Commission's authority to consider other factors. The Ninth Circuit did recognize, however, that prior to the 1976 amendments, offense severity was not considered with regard to parole decisions pertaining to offenders committed under the YCA. As we previ-

4. The court in *Duldulao v. United States Parole Commission,* 461 F.Supp. 1138 (S.D.Fla.1978) followed the rationale of *Shepard* in stating that the 1976 Parole and Reorganization Act "partly amended and partly repealed" the YCA. *See also, United States v. Jackson,* 550 F.2d 830, 832 (2nd Cir. 1977), where the court noted that "the remedy for the inequities created by the interaction between the Guidelines and the Act rests either in administrative reform or Congressional action;" *United States v. DiRusso,* 548 F.2d 372 (1st Cir. 1976), where the court refused to order the Parole Commission to consider the YCA offender's response to rehabilitation, but urged the Commission to do so; and *Benites v. United States Parole Commission,* 595 F.2d 518, 520 (9th Cir. 1979), where, without addressing the issue, the court did note that 18 U.S.C. § 5017 was amended in 1976 "to apply to youth offenders the same criteria for release as were applied to adults." Additionally, in *Smith v. Hambrick,* 637 F.2d

211 (4th Cir. 1980), the Fourth Circuit held that the Commission's decision not to release the defendant YCA offender on parole was not "arbitrary and capricious." The specific issue in that case was whether the Commission had sufficiently identified the factors preventing the defendant's release, that is, whether the Commission had given "a reasoned decision for its denial." The court held that the Commission had not failed in its responsibility to cite a reasoned decision to deny the inmates request for parole after having served 25 months under the YCA for voluntary manslaughter, even though the Commission's decision was based on considerations of the defendant's offense behavior and salient factor scores. In reaching its conclusion, the court stated that the Commission had determined under § 4206(a)(2) that, considering the severity of the defendant's offense, "release would depreciate the seriousness of his offense."

ously stated, however, if Congress had intended for the offense severity to preclude all other considerations it surely would have said so.

The language of § 4206(a) specifically requires Parole Commission consideration of both the nature and circumstances of the inmates' offense and the inmates' history and characteristics when considering the inmate for parole. When considering the history and characteristics of a Youth Corrections Act offender, it is incumbent upon the Commission to consider the fact that the youth offender was, in fact, sentenced as a youth offender, and that the trial court intended that the purposes and policies of the Youth Corrections Act would be applied to parole considerations regarding that offender.

From our examination of the entire structure of these Acts it is our opinion that the Youth Corrections Act is still good law. This fact has been implicitly recognized by courts which have addressed questions involving that Act subsequent to 1976. *See e. g., Durst v. United States*, 434 U.S. 542, 98 S.Ct. 849, 55 L.Ed.2d 14 (1978). To accept the arguments of the Parole Commission that the purposes and policies of the YCA no longer need be followed when making parole decisions would be to hold that in enacting the 1976 Parole Commission and Reorganization Act, Congress impliedly repealed the entire Youth Corrections Act. There is no provision in the later Act which shows any such intent either expressly or by implication.

As we have previously noted, the history and language of the Youth Corrections Act bespeaks the Act's purpose, which is to rehabilitate offenders through segregation and treatment. Extensive and repeated study of each youth offender on an individual basis is required. Moreover, the Parole Commission must periodically review the status of each youth offender. These repeated studies and reviews have little apparent purpose if progress in treatment is not to be an important factor in parole decisions. The indeterminate sentencing provisions of § 5017 find justification in the

Act's allowance for release based in large measure on a youth offender's progress and response to treatment. An individual youth offender whose adult sentence would have been a matter of months in confinement may, it is true, be required under the Youth Corrections Act to submit to an extended period of treatment geared toward rehabilitation. If release decisions are made without reference to the progress of the youth offender in the rehabilitation program, the indeterminate sentencing provisions become little more than arbitrary imposition of additional punishment on youth offenders. This would render the classification and treatment provisions of the Act meaningless. Such use of guidelines transforms indeterminate sentences into definite prison terms. It does away with individualized review and response to treatment in the face of Congressional intent that such should be the cornerstone of the sentencing and parole system.

The position taken by the Commission is that the 1976 amendments authorized the Commission to disregard the central aspect of the overall rehabilitative scheme; to adopt a view that rehabilitation is an impossible objective and it should be abandoned. Such a drastic change is contrary to law. We cannot accept such an approach particularly in view of the fact that there are several provisions of the YCA which have been left unaltered by the 1976 amendments and which indicate that response to treatment remains a factor that is to be considered by the Parole Commission in setting release dates.

A cardinal rule of statutory interpretation is that repeals of legislation by implication are disfavored. *Blanchette v. Connecticut General Ins. Corps.*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974); *Mercantile Nat'l Bank v. Langdeau*, 371 U.S. 555, 83 S.Ct. 520, 9 L.Ed.2d 523 (1963); *Amell v. United States*, 384 U.S. 158, 86 S.Ct. 1384, 16 L.Ed.2d 445 (1966); *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Plains Electric Generation and Transmission Cooperative, Inc. v. Pueblo of Laguna*, 542 F.2d

1375, 1376 (10th Cir. 1976). In a recent case, *Watt v. Alaska*, ── U.S. ──, at p. ──, 101 S.Ct. 1673, at p. 1678, 68 L.Ed.2d 80 (1981) the Supreme Court stated:

> [R]epeals by implication are not favored, *Morton v. Mancari*, 417 U.S. 535, 549 [94 S.Ct. 2474, 2482, 41 L.Ed.2d 290] (1974), quoting *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 [56 S.Ct. 349, 352, 80 L.Ed. 351] (1936). "The intention of the legislature to repeal must be 'clear and manifest.'" *United States v. Borden Co.*, 308 U.S. 188, 198 [60 S.Ct. 182, 188, 84 L.Ed. 181] (1939), quoting *Red Rock v. Henry*, 106 U.S. 596, 602 [1 S.Ct. 434, 27 L.Ed. 251] (1882). We must read the statutes to give effect to each if we can do so while preserving their sense and purpose. *Mancari, supra* [417 U.S.], at 551 [94 S.Ct. at 2483]; *see Haggar Co. v. Helvering*, 308 U.S. 389, 394 [60 S.Ct. 337, 339, 84 L.Ed. 340] (1940).

"In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 190, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978), quoting *Morton v. Mancari*, 417 U.S. 535, 550, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974); *In re Bear River Drainage District*, 267 F.2d 849, 851 (10th Cir. 1959) (intention must be clear).

It is our view that these rules which prohibit implied repeals of legislation apply with even greater strength or force where the implied repeal would have to have occurred not from the enactment of an independent statute, but from revisions of portions of statutory schemes. Clearly, Congress had before it the entire Youth Corrections Act when the amendments were passed in 1976. Nevertheless, provisions which require that response to treatment be considered in setting release dates were left unaltered. Also unchanged were provisions holding that the Youth Corrections Act inmates should be considered for unconditional release following one year of parole. Indeterminate sentences, segregation, classification, individualized treatment and the goal of rehabilitation all stand unchanged.

We find no irreconcilable conflict between the provisions of 18 U.S.C. § 4206 and the requirement that response to treatment is to be considered. The only conclusion that we can draw is that Congress intended rehabilitation to continue to be considered along with those standards which are outlined in § 4206. But the latter did not supplant the requirements of the Youth Corrections Act. A determination that a youth offender is sufficiently rehabilitated to become a useful citizen would constitute "good cause" for release notwithstanding the guidelines. 18 U.S.C. § 4206(c). Surely the Parole Commission would not deem it proper to release somebody who has not succeeded in the institution and has not been rehabilitated. Nor would they make this decision without regard to whether the institution has had a proper effect on him. Moreover, § 5005 provides that § 4201, *et seq.* shall govern the Commission's decisions regarding YCA offenders "except as otherwise provided." We therefore conclude that Congress intended the Parole Commission to consider both the factors set forth in § 4206 and the factors that are made relevant by the Youth Corrections Act in evaluating the parole prognosis of YCA offenders. We see no evidence that Congress has repealed expressly or impliedly the statutory scheme behind the Youth Corrections Act.

### V. *Conclusion*

The government has called attention to our decision in *Fronczak v. Warden, El Reno Reformatory*, 553 F.2d 1219, 1221 (10th Cir. 1977) as a case which holds that this court specifically rejected the contention that applying Parole Commission guidelines to youth offenders violated the Youth Corrections Act. We point out that we have not here taken the position that consideration of the guidelines is inconsistent with application of the factors contained in the Youth Corrections Act which emphasize individualized treatment and rehabilitation. So far there is no problem. However, there is some language in the *Fronczak* opinion which needs to be discussed.

We have held in the present case that the Commission is to not consider its guidelines exclusively to the point of neglect of the philosophy and factors contained in the Youth Corrections Act. To the extent that *Fronczak* suggests that disregard of the Youth Corrections Act in the making of parole decisions is permissible, therefore, there is some inconsistency between the two cases. The latter suggestion must be disregarded in the light of the study in depth which we made in the case at bar and which the trial court has made as well. The decision in *Fronczak* was presented as an isolated case and, to say the least, the present case arose in a very different context. The whole broad scale of the effect of the 1976 amendments was not considered in *Fronczak*. Therefore, insofar as the opinion in *Fronczak* is irreconcilable with the present decision, that very limited aspect of *Fronczak* must be disregarded.

*Fronczak, supra,* was decided on March 29, 1977, approximately ten months after the Parole Commission and Reorganization Act went into effect. The case involved a claim against the Board of Parole rather than the present Parole Commission, since it was a 1975 action of the Board in denying the petitioner's release which was the issue in that case. There was every reason to believe at that time that the Parole Board was following the purposes and provisions of the Youth Corrections Act in applying parole guidelines to offenders committed under that Act. Since that time, however, the Parole Commission has been established, and it has been almost universally recognized that both the Bureau of Prisons and the Parole Commission have changed their approach to the treatment of youth offenders and have changed their policies accordingly. That's what this lawsuit is about. The courts have almost unanimously recognized this change in policy, as the previous sections of our present opinion show. The trial court in the present case clearly recognized the condition when it said:

> Simply put, the United States Parole Commission has decided that all inmates who come within its jurisdiction should be subject to a determinate sentence. Accordingly, each inmate, early in confinement, is given a presumptive parole date indicating the expected time for release, assuming observance of the rules of the institution. Voluntary participation in educational, vocational and other program opportunities has little effect in determining the time to be spent in confinement.

*See* 469 F.Supp. at 230.

The fact that each youth offender is informed shortly after being sentenced as to when he is entitled to be considered for parole under the guidelines, indicates that the extent of the prisoner's rehabilitation is not a factor built-into the means in which the Parole Commission is applying the guidelines to the YCA offenders. It is uncontroverted that Youth Corrections Act offenders rarely are able to meet the Commission's standards for a "clearly exceptional" record of good program achievement required under the guidelines in order for an inmate to be released earlier than the date he is originally scheduled to be considered for parole in accord with the guidelines. This non-recognition is plainly contrary to the demands of the Youth Corrections Act. It must be halted.

The trial court has called attention to the testimony of Dr. Hoffman, Director of Research for the Parole Commission, that the adoption of guidelines to youth offenders sentenced under the YCA was partly "a response to public criticism of the lack of articulated standards for the exercise of the parole discretion and the alleviation of disparity in sentencing." 469 F.Supp. at 233. It is obvious that, as the trial court recognized, "the Parole Commission's failure to follow the law results from the good faith belief that what they are doing is a better approach with more productive results in the public interest." *Id.*

Whether or not the Commission is in good faith is not the question. We have not said that bad faith existed. But even if the members are acting in good faith, this does not justify their "failure to follow the law." We are dealing with a subject matter which is sensitive and highly important. The

Commission seeks to take away fundamental human rights, and rights defined by Congress, without even consulting Congress or without seeking legislative changes. The only favorable comment that can be made is that the Commission has been candid in admitting its views and objectives.

Accordingly, therefore, we must reach a conclusion opposite to that taken by the Commission. The rigid approach of the Commission in following their own guidelines to the exclusion of factors relevant to the rehabilitative purposes of the YCA cannot be approved. The Commission's application of its guidelines is inconsistent with positive law.

We must reach the same conclusion with regard to the failure of the Commission to actually consider and apply each YCA offender's eligibility for unconditional release after he has served one year on parole.

The judgment of the district court is affirmed in all respects.