774 F.2d 1164
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
United States of America, Plaintiff-Appellee,
v.
Kurtis Ford Parsch, Defendant-Appellant.
 No. 84-1348
 United States Court of Appeals, Sixth Circuit.
 9/17/85
 
 E.D.Mich.
 AFFIRMED
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN
 Before: JONES and CONTIE, Circuit Judges; and BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant Kurtis Parsch appeals from a judgment of conviction, on a jury verdict, for violation of 18 U.S.C. Sec. 474 challenging the admission of testimony pursuant to Fed. R. Evid. 702. For the reasons that follow, we affirm.
 
 I.
 
 2
 On January 25, 1984, Parsch was indicted and charged with making counterfeit obligations of $528,070 with intent to defraud, 18 U.S.C. Sec. 471, and with knowingly and unlawfully making and executing paper plates in the likeness of plates designated for the printing of obligations of the United States, 18 U.S.C. Sec. 474.
 
 
 3
 At trial, John Smiley, a detective with the Michigan State Police and supervisor of the narcotics crew, testified that Parsch was a confidential informant in April 1983, working with Detective Cremonte. Smiley testified that Parsch only received expenses as payment, and that on about April 14, 1983, Smiley called Secret Service Special Agent Keleman and told him that Parsch was setting up a swap of cocaine for counterfeit money.
 
 
 4
 Detective Cremonte testified that in January 1983, Parsch contacted the police about being an informant. On April 13 or 14, 1983, Parsch called Cremonte and told him that Gary Garcia wanted Parsch to exchange $200,000 in counterfeit money for a kilo of cocaine. Cremonte relayed this information to Smiley. Cremonte testified that Parsch had previously provided information about dope dealers that led to their arrest. Parsch had previously attempted, but failed, to set up Michael Schill, an alleged major cocaine distributor in Kentucky. On April 14 or 15, Keleman, Parsch and Cremonte met and Keleman told Parsch that Keleman would have to take custody of the $200,000. Cremonte testified that Parsch wanted to set up other dope dealers with the counterfeit and that Parsch had discretion in arranging set-ups but was difficult to control.
 
 
 5
 Agent Keleman, an agent for 18 1/2 years and supervisor of the counterfeit squad, testified that on April 14 he was called by Smiley and that on April 18 he met with Parsch and Cremonte. Parsch told Keleman that he had exchanged counterfeit money before as a courier. Parsch claimed that the counterfeit was mimeotone, a process Keleman had never heard of. Parsch was vague about details of the transaction and refused to wear a wire, although he expected the transaction to take place soon. On April 27, at a meeting between Cremonte, Keleman, Parsch and Special Agent Unro, defendant said he planned to go through with the exchange but was evasive about the details, and said that he did not trust Keleman or Unro.
 
 
 6
 On April 29, Cremonte received some of the counterfeit from Parsch and gave it to Keleman. Cremonte and Keleman went to defendant's residence where they found another bag of cash. Parsch claimed that the money had been delivered by courier that morning in a money vest, and that Parsch would soon be getting further instructions. Parsch told Keleman that he had prior printing experience, at which point Keleman gave Parsch his Miranda rights, and Parsch admitted that he had manufactured the money. Defendant told Keleman that he had manufactured the money to set up Schill to keep his credibility with the Michigan State Police. Parsch turned over additional counterfeit that had been stored in two dog food bags. Parsch told Keleman that he had used an A. B. Dick 360 offset press and electrostatic paper maker, a cutter, hand cutter, and paper plates. Parsch gave Keleman the printing plates, printing blanket, two canisters of ink and other scrap. Defendant told Keleman that the paper used was mimeotone.
 
 
 7
 Keleman identified the various materials turned over by Parsch and their role in the printing process. Keleman identified the paper plates Parsch was accused of manufacturing. Further, Keleman testified that Parsch told him that Parsch had made the plates. Keleman testified that
 
 
 8
 Offset printing is printing which is done by an indirect method and this blanket is the piece of equipment that actually prints the money onto the paper, transfers the image to the paper.
 
 
 9
 Keleman testified that the quality of the counterfeit was poor, and that defendant never said he intended to pass or sell the money. Further, Keleman testified that he never actually made plates, but that he had seen other agents make aluminum, not paper, plates.
 
 
 10
 Parsch objected to Keleman's testimony regarding the purpose of a masking sheet, identification of paper plates, and use of both items. The district court overruled Parsch's objectives, finding that '[t]his man is the head of the Counterfeiting Section of the Secret Service in Detroit and he is well-qualified to testify.'
 
 
 11
 Parsch testified that he was still acting as a confidential informant and that he got involved because he thought drug trafficking was wrong. Parsch printed the currency at his old employer's, Plante & Moran. Parsch testified that he never intended to sell or pass the counterfeit money and that the sole purpose was to catch Schill.
 
 
 12
 Trial began on March 19, 1984, and on March 26, Parsch was acquitted on the first count and convicted on the second count, 18 U.S.C. Sec. 474. On May 3, Parsch's motion for judgment of acquittal was denied, and on May 4, he was sentenced to three years probation.
 
 
 13
 This case previously came before this court for a hearing on the merits of Parsch's appeal. At oral argument, the government represented that Parsch's conviction had been set aside by Judge Gilmore on January 7, 1985 pursuant to the Youth Corrections Act, 28 U.S.C. Sec. 5021(b). The panel heard no argument on the merits, but instead requested the district court to clarify its order. On May 30, 1985, Judge Gilmore responded that 'it was my intention to set aside the conviction pursuant to former 18 U.S.C. Sec. 5021(b) and nothing more.' The parties filed supplemental briefs on the mootness question and now that question and the merits of the case are before the court.
 
 II.
 18 U.S.C. Sec. 5021(b) provides:
 
 14
 Where a youth offender has been placed on probation by the court, the court may thereafter, in its discretion, unconditionally discharge such youth offender from probation prior to the expiration of the maximum period of probation theretofore fixed by the court, which discharge shall automatically set aside the conviction, and the court shall issue to the youth offender a certificate to that effect.
 
 
 15
 Section 5021 was repealed on October 12, 1984 as part of the Comprehensive Crime Control Act of 1984, 98 Stat. 2027. Neither party appealed Judge Gilmore's order of January 7, 1985, nor does either party contend that Sec. 5021 did not apply to Parsch's conviction. Accordingly, we need not consider the validity of or the legal basis for the district court's action, only the consequences arising therefrom.
 
 
 16
 In Sibron v. New York, 392 U.S. 40 (1968), the Court held that 'a criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction.' Id. at 57. In Ginsberg v. New York, 390 U.S. 629 (1968), the Court held that the possibility that an obscenity conviction might result in revocation of a business license was a sufficient collateral consequence to result in a justiciable controversy. Id. at 633-34 n.2. See also Benton v. Maryland, 395 U.S. 784, 790 (1969). In Street v. New York, 394 U.S. 576, 580 n.3 (1969), the Court found that a case was not moot when a defendant's conviction could be used for impeachment, enhancement of his sentence, and consideration in sentencing. The Court also noted that the defendant's employer had instituted disciplinary proceedings against him as a result of the conviction. The Court held that '[h]ere there is an actual rather than merely a potential threat that appellant will be deprived of his employment, albeit only temporarily.' Id. More recently, in Ball v. United States, 105 S. Ct. 1668, 1674 (1985), the Court found that collateral consequences existed because.
 
 
 17
 the presence of two convictions on the record may delay the defendant's eligibility for parole or result in an increased sentence under a recidivist statute for a future offense. Moreover, the second conviction may be used to impeach the defendant's credibility and certainly carries the societal stigma accompanying any criminal conviction.
 
 
 18
 Accordingly, we consider the collateral consequences that might result from a conviction set aside pursuant to 18 U.S.C. Sec. 5021(b).
 
 
 19
 Defendant argues that the case is not moot because his conviction remains on the record and is available to potential employers. In Tuten v. United States, 460 U.S. 660, 664-65 (1983), the Court discussed the Sec. 5021(b) set aside.
 
 
 20
 Congress recognized that a criminal conviction often carries with it numerous civil and social disabilities. For example, a conviction may result in the loss of the rights to vote, to hold a public office, to serve on a jury, and to practice various occupations and professions. As in this case, a conviction may also make an offender subject to increased penalties for subsequent convictions. Like various state expungement statutes, Sec. 5021 enables an eligible youth offender to reenter society and conduct his life free from the disabilities that accompany a criminal conviction.
 
 
 21
 (footnotes omitted). Although the Court referred to the statute as an 'expungement statute', most courts of appeals have held that Sec. 5021(b) does not require expunction of the conviction. In United States v. Doe, 732 F.2d 229, 230-31 (1st Cir. 1984), the court observed that
 
 
 22
 we have little difficulty ruling out destruction of Doe's record of conviction. Not only does society have a legitimate need for maintaining accurate records of conviction to further bona fide criminal investigations, there are positions of trust to which accurate knowledge of a person's past might be of critical importance.
 
 
 23
 Further,
 
 
 24
 the set-aside provision was not contemplated as a method of concealing the fact of conviction from employers but rather as a way of opening up job opportunities to youth offenders in positions which, for reasons of company policy, government regulation, or otherwise, would not be available for ex-convicts.
 
 
 25
 Id. at 231. The court held that expungement of the conviction was not required. '[W]e read the set-aside provision as eliminating any legal disabilities that might flow from a conviction, but not as helping a youth offender conceal his past or lie to prospective employers.' Id. at 232. See also United States v. McMains, 540 F.2d 387 (8th Cir. 1976). The Ninth Circuit has reached a similar conclusion. 'Nothing in that section [Sec. 5021] suggests that the record may not be retained for later use by another court.' United States v. Campbell, 724 F.2d 812 (9th Cir. 1984). Further,
 
 
 26
 18 U.S.C. Sec. 5038 specifically permits the release of the sealed record of a Federal Juvenile Delinquency Act (FJDA) proceeding, whether or not there is a conviction, to 'another court of law,' and to 'an agency preparing a presentence report for another court.' If a sealed record of a proceeding involving a person under the age of 18 may be used by another court, certainly an expunged record of an FYCA conviction applicable to a person under the age of 22 may be so used.
 
 
 27
 Id. at 813. We likewise have held that expunction is not required under Sec. 5021 since Congress clearly knew how to provide for expunction when it so desired, 21 U.S.C. Sec. 844(b)(2). United States v. Doe, 556 F.2d 391, 393 (6th Cir. 1977). Contra United States v. Doe, 730 F.2d 1529 (D.C. Cir. 1984); Watts v. Hadden, 651 F.2d 1354, 1373 n.3 (10th Cir. 1981); Doe v. Webster, 606 F.2d 1226, 1244 (D.C. Cir. 1979); United States v. Doe, 579 F. Supp. 1351, 1354 (N.D. Ill. 1984).
 
 
 28
 The decisions finding that expunction is not required under the statute clearly indicate that other courts and employers have access to the record of conviction. Therefore, negative collateral consequences are likely to flow from a conviction, which, although set aside, is still available to increase sentence length and deny job opportunities. The absence of an expunction requirement weighs against a finding of mootness.[1]
 
 
 29
 Even if expunction were available, it is not clear that Parsch's appeal would be mooted. In Dickerson v. New Banner Institute, Inc., 460 U.S. 103 (1983), the Court held that a state conviction was still a 'conviction' for 18 U.S.C. Sec. 922 purposes even though it had been expunged. '[E]xpunction does not alter the legality of the previous conviction and does not signify that the defendant was innocent of the crime to which he pleaded guilty.' Id. at 115. The Court further noted that presidential pardons do not exempt a conviction from Sec. 922, and that when Congress intended to completely discharge a person it knew how to do so.
 
 
 30
 Congress . . . specifically provided in Sec. 844(b)(1) that such discharge or dismissal 'shall not be deemed a conviction for purposes of disqualifications or disabilities imposed by law upon conviction of crime . . . or for any other purpose.' This provision would be superfluous if Congress had believed that expunction automatically removes the disqualification. Congress obviously knew the plain meaning of the terms it employed in statutes of this kind, and when it wished to create an exception for an expunged conviction, it did so expressly.
 
 
 31
 Id. at 118. Further, in Tuten, the Court suggested that convictions set aside under Sec. 5021(b) could still serve as convictions under Sec. 922.[2] Therefore it appears that there is a substantial risk that Parsch may be subject to prosecution under Sec. 922 even though his conviction had been set aside.
 
 
 32
 Accordingly, we conclude that Parsch's appeal is not moot and consider its merits. But see Guy v. Ciccone, 439 F.2d 400 (8th Cir. 1971); Jamison v. United States, 279 F.2d 892 (6th Cir. 1960); Kayamakcioglu v. United States, 418 F. Supp. 356, 359 (S.D. N.Y. 1976).
 
 III.
 Fed. R. Evid. 702 provides:
 
 33
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 
 
 34
 We have recently reviewed the standards for assessing the propriety of expert testimony in criminal cases.
 
 
 35
 In applying this rule, this Court has adopted a four-point analysis. For expert testimony to be admissible under Rule 702, it must be shown that the witness is (1) a qualified expert; (2) testifying on a proper subject; (3) in conformity to a generally accepted explanatory theory; (4) the probative value of which outweighs any prejudicial effect. United States v. Green, 548 F.2d 1261, 1268 (6th Cir. 1977); United States v. Smith, 736 F.2d 1103, 1105 (6th Cir.), cert. denied, 105 S. Ct. 213 (1984). A district court's decision to admit expert testimony shall not be reversed unless there was a clear abuse of discretion. See United States v. Green, 548 F.2d at 1268. We shall find an abuse of discretion only if we have 'a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.' Taylor v. United States Parole Commission, 734 F.2d 1152, 1155 (6th Cir. 1984) (citations omitted).
 
 
 36
 United States v. Kozminski, Case No. 84-1288, slip op. at 5 (6th Cir., August 23, 1985). Parsch's objections focus primarily on the qualifications of the expert. Keleman's testimony was admitted to aid the jury in understanding the printing process. While it is clear that Keleman's title alone could not qualify him as an expert and that more formal consideration of his credentials might be appropriate, the district court did not abuse its discretion in admitting the testimony.
 
 
 37
 Further, it is clear that the harmless error rule applies to erroneous admission of expert testimony. United States v. Smith, 736 F.2d 1103, 1107 (6th Cir.), cert. denied, 105 S. Ct. 213 (1984). Even if an abuse of discretion could be found, it is clear that defendant suffered no prejudice to his right to a fair trial from such abuse. The challenged testimony was not of such a nature as to persuade the jury toward any particular conclusion respecting Parsch's guilt. We cannot say that the prejudice of the evidence substantially outweighed its probative value. Smith, 736 F.2d at 1107; United States v. Hans, 684 F.2d 343, 346 (6th Cir. 1982).
 
 
 38
 Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 This conclusion is further supported by the case of Fite v. Retail Credit Company, 386 F. Supp. 1045 (D. Mont. 1975), aff'd, 537 F.2d 384 (9th Cir. 1976), an action by a party convicted under the YCA against a credit agency that reported his conviction. The court held in favor of the agency, noting that 'a conviction under the Youth Corrections Act does not disappear when a certificate of discharge is issued.' Id. at 1047. Further, '[t]hat the conviction is set aside does not alter the fact of the theft nor the admission of it.' Id
 
 
 [2]
 'Of course, federal legislation may impose disabilities even on persons whose convictions have been expunged.' 460 U.S. at 665 n.9