FILED
United States Court of Appeals
Tenth Circuit

**January 29, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROY M. ALEXANDER,

          Petitioner-Appellee,

v.

UNITED STATES PAROLE
COMMISSION,

          Respondent-Appellant.

No. 06-1343

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 04-CV-01935-RPM)**

---

John M. Hutchins, Assistant United States Attorney (Troy A. Eid, United States
Attorney and Paul Farley, Assistant United States Attorney, with him on the
briefs), Denver, Colorado, for Respondent-Appellant.

Daniel J. Sears, Denver, Colorado, for Petitioner-Appellee.

---

Before **McCONNELL**, **EBEL** and **GORSUCH**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

      The Federal Youth Corrections Act ("YCA"), enacted in 1950, was

designed to prevent youths from hardening into habitual offenders by providing

them with treatment aimed at achieving rehabilitation. 18 U.S.C. § 5010

(repealed 1984). Because the statute was repealed in 1984, there are few inmates remaining who were sentenced under the Act. Petitioner-appellee Roy Alexander may be the only one. The brutality of his crime—a murder and robbery of four individuals—sets him apart from most YCA offenders and makes his case particularly difficult. Because Mr. Alexander's crime was so heinous, the United States Parole Commission ("Commission") has repeatedly denied parole despite Mr. Alexander's successful completion of his treatment program. Though on each previous habeas petition the district court found the Commission's denial supported by the evidence, on his most recent petition the district court granted him relief, ordering the Commission to take into consideration possible conditions on release in its analysis of Mr. Alexander's parole eligibility, and to develop a pre-release plan for Mr. Alexander, to be followed by the Bureau of Prisons. The Commission appeals from this order. We take jurisdiction under 28 U.S.C. § 1291 and 28 U.S.C. § 2253 and affirm in part and reverse in part.

## I. BACKGROUND

In 1981, at the age of sixteen, Roy Alexander and another individual committed a ruthless murder and robbery in which they shot and killed four members of a family, including a young child. The jury sentenced Mr. Alexander to four consecutive life terms. Because of his young age, however, the judge sentenced him under the YCA. 18 U.S.C. § 5010(c) (repealed 1984). By sentencing him under the YCA, the district judge found that Mr. Alexander could

-2-

benefit from the YCA's rehabilitative and training programs, which might eventually assist him in reentering society. *See Dorszynski v. United States*, 418 U.S. 424, 433 (1974). However, the judge stated that Mr. Alexander should spend at minimum fifteen years, and more likely at least twenty to twenty-five years, in prison.

## A. The Federal Youth Corrections Act

The YCA was designed "to promote the rehabilitation of those youths who the sentencing judge believes show promise of becoming useful citizens." *Watts v. Hadden*, 651 F.2d 1354, 1368 (10th Cir. 1981). *See also* H.R. Rep. No.81-2974, reprinted in 1950 U.S.C.C.A.N. 3984; *Dorszynski*, 418 U.S. at 433. Statistics demonstrated that habitual offender characteristics were most likely to develop between the ages of 16 and 22; to combat that, the YCA aimed to "substitute rehabilitative principles for retributive methods of treating antisocial behavior," *Watts*, 651 F.2d at 1368, in an attempt to "restore normal behavior patterns," *Dorszynski*, 418 U.S. at 432–33. Because "the execution of sentence was to fit the person, not the crime for which he was convicted," *id.* at 434, the sentencing judge was given flexibility in his sentencing and could depart from "traditional sentencing patterns," instead focusing on "correction and rehabilitation," *Watts*, 651 F.2d at 1374. *See also Benedict v. Rodgers*, 748 F.2d 543, 545 (10th Cir. 1984). The YCA's goal was to achieve eventual release of the offender once he was effectively rehabilitated. *Watts*, 651 F.2d at 1376.

-3-

To accomplish this goal, immediately after sentencing, the youth receives an individualized program plan designed to achieve rehabilitation. Once the Warden certifies that the youth offender has completed his program, the Warden gives a recommendation either in favor of or against parole and the Commission holds a release hearing to evaluate the youth offender's response to treatment. *Benedict*, 748 F.2d at 547; *Christians v. Rodgers*, 592 F.Supp. 71 (D.Colo. 1984). The Commission considers several factors in making its parole decision. Under the Parole Commission and Reorganization Act, the Commission must determine: (1) whether release would depreciate the seriousness of the inmate's offense or promote disrespect for the law; and (2) whether release would jeopardize public welfare. 18 U.S.C. § 4206(a) (repealed 1984). However, the purposes underlying the YCA must also be considered, and the "offenders' response to treatment is to be a determinative factor when considering those inmates' eligibility for parole." *Watts*, 651 F.2d at 1380; *Benedict*, 748 F.2d at 546. To evaluate response to treatment, the Commission must consider whether the prisoner received "sufficient corrective training, counseling, education, and therapy." 28 C.F.R. § 2.64(d)(1). Additionally, the Commission must consider the inmate's work record and prison misconduct. *Id*. at (d)(3)(v), (d)(4). In some YCA cases, this Court found that the Parole Commission ignored this directive and abused its discretion by failing to consider rehabilitation or the individual offender's response to treatment. *See Watts,* 651 F.2d at 1375; *Benedict*, 748 F.2d at 546.

### B. Mr. Alexander's Response Under the YCA

Mr. Alexander struggled during the early years of his incarceration, but by 1987 he began responding positively to treatment. He completed his program plan, which included 100 hours of group counseling and 500 hours of individual counseling. After 1987, he committed no disciplinary infractions. *See Alexander v. Crabtree*, No. 93-1019, 2 F.3d 1160, 1993 WL 307649, at *1 (10th Cir. Aug. 9, 1993) (unpublished table decision) ("*Alexander I*"). In 1991, the Chief of Psychology at FCI Sheridan, where Mr. Alexander was imprisoned, stated that Mr. Alexander "ha[d] met both the letter and the intent of the Youth Corrections Act," and that Mr. Alexander did "not suffer from a major psychological disorder." *Id*. In1992, the Warden recommended that Mr. Alexander be paroled. *Id.*

The Parole Commission declined to follow this recommendation, expressing concern over the problems Mr. Alexander exhibited prior to 1987 and his apparent lack of remorse. The Commission found release would pose "an unwarranted risk to the public and also, without good cause, depreciate the heinous nature of [Mr. Alexander's] offense." *Id*. Mr. Alexander filed a habeas petition with the district court, claiming that the Commission had not complied with the YCA because it failed to give sufficient weight to his rehabilitation. *Id.* at *2. The district court denied the petition, and we affirmed the district court but remanded the case to the Commission, requiring it to provide additional evidence

supporting its denial of parole. *Id*. at *3. The Commission ordered Mr. Alexander to be evaluated by a psychiatrist, who recommended that Mr. Alexander receive "insight-oriented psychotherapy." *Alexander v. Crabtree*, No. 94-1375, 45 F.3d 439, 1994 WL 722961, at *2 (10th Cir. Dec. 20, 1994) (unpublished table decision) ("*Alexander II*"). The Commission again denied parole in a special reconsideration hearing. Mr. Alexander filed his second habeas petition, which the district court again denied. We affirmed on appeal. *Id.* at *3.

Mr. Alexander received interim reconsideration hearings in 1995, 1996, and 1997. *See* 28 C.F.R. § 2.64(c). Each time, the Commission denied parole. In 1998, Mr. Alexander waived his right to an interim hearing and instead filed his third habeas petition challenging the denial of parole, which the district court denied. *Alexander v. United States Parole Comm'n*, No. 99-1262, 211 F.3d 1277, 2000 WL 517928, (10th Cir. May 1, 2000) (unpublished table decision) ("*Alexander III*"). This Court affirmed on appeal, finding that Mr. Alexander's failure to consistently show remorse, combined with the serious nature of his offense, provided a rational basis for the Commission's denial of parole. *Id.* at *3.

In 2001, Mr. Alexander received a de novo parole hearing. It was during this hearing that Mr. Alexander first accepted full responsibility for his crime. However, the Commission again denied parole, continuing the case for another 15

years. On appeal, the National Appeals Board remanded for a new hearing and requested a current psychological evaluation to assess the impact of psychological counseling and therapy on Mr. Alexander's rehabilitation. The psychologist found that Mr. Alexander was not mentally ill and did not experience emotional distress. The Commission again denied parole, concerned that Mr. Alexander's remorse was not sincere and stating in its Notice of Action that "there continues to be significant doubt that your response to treatment programs has reduced the risk of further risk to the community in that it is found you are not remorseful . . . ." R. at 126. The National Appeals Board affirmed.

Mr. Alexander received his most recent interim hearing in 2003. He was represented by Drug Treatment Specialist Doug Tucker, who had represented him in prior hearings and had worked with him in his treatment since 1991. The examiner, summarizing Mr. Tucker's representation, stated that "the subject accepts responsibility for his behavior, . . . expressed his remorse and has participated in all available programs to prepare himself for return to the community . . . Mr. Tucker believes that subject no longer represents a threat to the community if ordered for release." *Id*. at 143. Nonetheless, the examiner held that

> There is no history of any mental health problems prior to the current offense. The only explanation is that subject was unable to handle the everyday stresses of life as a teenager. The question at this point is whether or not he has developed the mechanisms to handle stresses of every day life should he be returned to the community. Clearly

for having been in custody for well over 20 years the stresses associated with transition are extremely high. The examiner has some concerns as to whether or not the subject has the ability to make that transition without aggressive acting out as demonstrated in the current offense.

*Id*. at 144. He also stated that

Subject continues to be a more serious risk than his scores would indicate based on the severity of the offense. The subject at the age of 17 shot and killed two women, one man and a 4 year old child multiple times and took their weapons. This was subject's first conviction of record and he had no history of aggressive aberrant behavior. Given the absence of provocation or pattern the subject's risk continues to be more serious be [sic] there are no indices to suggest that the subject is inclined to act out in an aggressive manner.

*Id*. at 143–44. The Commission agreed with the examiner and denied parole. Mr. Alexander appealed this decision to the National Parole Board, which affirmed the Commission's denial. Mr. Alexander subsequently filed this habeas petition in the District Court of Colorado.

After reviewing the Commission's decisions, the district court held that the Commission's denial of parole was arbitrary and capricious. The court found that while the Commission focused primarily on the serious risk that Mr. Alexander might pose to the public upon release, it failed to consider the wide range of conditions the Commission could impose on Mr. Alexander to mitigate that risk. The court found this unreasonable, emphasizing that Mr. Alexander would never receive unconditional release. It ordered the Commission to reexamine Mr.

Alexander's parole considering potential release conditions and to develop a pre-release program for Mr. Alexander. The Commission appeals from this order.

## II. ANALYSIS

"Judicial review of the Parole Board decisions is narrow. The standard of review of the action by the Parole Commission is whether the decision is arbitrary and capricious or is an abuse of discretion." Paz v. Warden, Fed. Corr. Ins., 787 F.2d 469, 472 (10th Cir. 1986) (internal quotation marks omitted).

### *A. Finality*

Before reaching the merits, we must determine whether the district court's order was final, giving us jurisdiction over the case. *Browder v. Dir., Dep't of Corr.*, 434 U.S. 257, 265 (1978). To be final under 28 U.S.C. § 1291, an order must "end[] the litigation on the merits and leave[] nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945). In the context of a habeas petition, "an order that contains no affirmative statement of the relief granted or to be granted is not final for purposes of appellate review under 28 U.S.C. § 1291." *Allen v. Hadden*, 738 F.2d 1102, 1106 (10th Cir. 1984). *See also Heirens v. Mizell*, 729 F.2d 449, 454 (7th Cir. 1984) ("A final judgment in a habeas corpus case either denies the petition or orders the prisoner released at a specified time."(internal quotations marks omitted)). Unconditional release, however, is not a prerequisite to finality. For example, a conditional order that

-9-

directs the state to retry the defendant within sixty days or to release him is final. *Allen*, 738 F.2d at 1106.

Unfortunately, not all orders state clearly whether release has been granted or denied. When examining ambiguous orders, it is helpful to ask whether the order contemplates further substantive proceedings, or whether it has disposed of all issues pending between the two parties. *Compare Marshall v. Lansing*, 839 F.2d 933, 940–41 (3d. Cir. 1988); *Fielding v. Degnan*, 587 F.2d 619, 621–22 (3d. Cir. 1978) *with Broussard v. Lippman*, 643 F.2d 1131, 1133–34 (5th Cir. April, 1981); *United States ex rel Burton v. Greer*, 643 F.2d 466 (7th Cir. 1981).

The district court's order states that the Parole Commission

> shall proceed [within 90 days] with the development of an appropriate pre-release program to be followed by the Bureau of Prisons to assist Roy M. Alexander in making the transition from his institutional confinement to prepare him for a conditional release and shall establish such conditions for his release as are appropriate for him.

R. at 223. There are two ways to interpret this order. One is that, after considering parole conditions and establishing the release plan, the Commission must follow that plan and actually release Mr. Alexander. Under this construction, "to be followed" is a directive. The alternative reading is that the district court ordered the Parole Commission to consider conditions and a pre-release plan along with any other factors it deemed appropriate, but it was free to deny parole depending on the balance of these factors and other statutory

considerations.  *See* 18 U.S.C. § 4206(a) (repealed 1984).  Under this reading, "to be followed" is merely descriptive, indicating that the plan is designed for use by the Bureau of Prisons only once the Commission determines parole is appropriate. The former interpretation would be a final order because it requires release, albeit at a date still to be set by the Commission.  The latter would not, because it does not grant the writ and contemplates further proceedings depending on the outcome of the Parole Commission's reevaluation.  *Allen,* 738 F.2d at 1106.

Because the text of the order is consistent with either interpretation, we must look to the purpose of a pre-release plan to determine the more likely reading.  A pre-release plan establishes a program to assist the prisoner in his reintegration into society.  28 C.F.R. § 2.33; *Kirk v. White*, 627 F.Supp. 423, 425 (E.D.Va. 1986); *Houston v. Nelson*, 453 F.Supp. 874, 876 (D.Conn.1978).  The Commission tells us (and Mr. Alexander does not dispute it) that the pre-release plan is generally developed *after* the presumptive release date is set—in other words, after the Commission determines parole is appropriate by a certain date. Aplt's Br. at 24 ("The regulation requires that a pre-release plan be formulated under the YCA once a release date is set; it does not mandate a pre-release plan when the Commission has stated that release is currently inappropriate."). *See also* 28 C.F.R. § 2.12(d) (the fulfillment of "[a] presumptive parole date shall be contingent upon an affirmative finding by the Commission that the prisoner has a continued record of good conduct and a suitable release plan . . . ."); 28 C.F.R. §

-11-

2.28(e) (" release . . . shall be conditioned upon the completion of a satisfactory plan for parole supervision.").  After the Regional Commissioner approves the plan, the presumptive parole date becomes an effective release date and the inmate is released on that date unless he has new violations or lapses in his release plan completion.  28 C.F.R. § 2.1(h);  28 C.F.R. § 2.14(b)(4)(ii); 28 C.F.R. § 2.28(b) (e)-(f); 28 C.F.R. § 2.34.  The fact that the presumptive release date is generally a prerequisite for a pre-release plan suggests that the district court intended the Commission to set that date.

Language in the district court's opinion supports this theory.  The court stated that

> [t]he failure of the Commission to consider the setting of a *presumptive conditional release date* and the development of a release plan tailored to reasonable requirements for conditions applicable to Roy Alexander makes the continuing refusal to grant conditional release an arbitrary refusal to exercise the discretion the Commission has under the YCA . . . Under *Watts v. Hadden* this Court has the duty and authority to compel the Commission to comply with the YCA by mandating the action necessary to implement its provisions.

R. at 220 (emphasis added).  The court emphasized the Commission's failure to set a presumptive conditional release date as one of the reasons the Commission was arbitrary and capricious, which suggests that the court thought eventual release was required.

-12-

We believe, therefore, that by ordering the Commission to create a pre-release plan, the court also ordered the Commission to establish a presumptive release date. This is the functional equivalent of a conditional release order: though the Commission retains discretion to establish the release date and parole conditions, it has no discretion to deny him release. Therefore, the writ was granted, and it is a final order. We can proceed to the merits.

### B. Conditions on Release

The district court found that the Commission's evaluation of the risk Mr. Alexander posed to the public was arbitrary and capricious because it failed to take into consideration conditions the Commission could impose on release that would alleviate that risk. Because the Commission was free to impose conditions, such as daily reporting and required employment, the Commission's calculus of the risk was flawed and incomplete. The Commission argues that it is not required to consider conditional release in its evaluation. We agree with the district court that, under the circumstances of this case, the Commission was required to consider conditions when evaluating Mr. Alexander's risk to the public.

When conducting its parole decision, the Commission must consider the seriousness of Mr. Alexander's offense and the risk he poses to the public, 18 U.S.C. § 4206(a)(1)-(2) (repealed 1984), as well as his demonstrated rehabilitation. *Watts,* 651 F.2d at 1380. In the 2003 hearing, the examiner

-13-

focused primarily on the risk Mr. Alexander posed to society in denying parole, stating:

> Subject had no history of violence or drug abuse. There is no history of any mental health problems prior to the current offense. The only explanation is that subject was unable to handle the everyday stresses of life as a teenager. The question at this point is whether or not he has developed the mechanisms to handle stresses of every day life should he be returned to the community. Clearly for having been in custody for well over 20 years the stresses associated with transition are extremely high. This examiner has some concerns as to whether or not the subject has the ability to make that transition without aggressive acting out as demonstrated in the current offense.

R. at 144. The National Appeals Board, affirming the denial, relied on the same factor, holding that

> there continues to be a significant doubt that your response to these treatment programs has reduced the risk that you pose to the community if released on parole at this time. The Commission is not convinced given your statements during your hearing that you have acknowledged the full extent of your crime and are remorseful.

R. at 152. The Commissioner and the National Appeals Board did acknowledge Mr. Alexander's continued participation in treatment programs and positive response to treatment. It also found that release would diminish the seriousness of his offense given the nature of his crime.

Under 18 U.S.C. § 5017(a)-(b), there is no unconditional release for youth offenders until at least one year subsequent to parole. *See also id*. § 5010(a) (repealed 1984). Additionally, the Commission has full discretion to impose conditions until five years after release. If at any point Mr. Alexander were to

violate those conditions, the Commission could immediately return him to custody. *Id*. § 5020 (repealed 1984). After five years of parole, the Commission must grant unconditional release unless there is a "likelihood that the parolee will engage in conduct violating any criminal law." *Id*. § 4211(c)(1) (repealed 1984).

These conditions that the Commission can place on parole are commonly relevant to the potential risk the inmate poses to society.

> The conditions of parole serve a dual purpose; they prohibit, either absolutely or conditionally, behavior that is deemed dangerous to the restoration of the individual into normal society. And through the requirement of reporting to the parole officer and seeking guidance and permission before doing many things, the officer is provided with information about the parolee and an opportunity to advise him.

*Morrissey v. Brewer*, 408 U.S. 471, 479 (1972). *See also Housler v. Nelson*, 453 F.Supp. 874, 877 (D.C. Conn. 1978) (parole conditions are designed to "further [reintegration of convicted criminals into society as constructive components] . . ." while ensuring that "reintegration is accomplished effectively and with a minimal risk to the public welfare."). Typical conditions include mandatory drug testing, curfews or home monitoring systems, employment requirements, and approved residence requirements. 18 U.S.C. § 4209 (repealed 1984); 28 C.F.R. § 2.33. These ameliorate the risk the inmate poses to the public as they make his transition less drastic by providing structure and supervision in his daily life. Additionally, if the parolee fails to meet one of the conditions, the supervisor is

immediately alerted to the problem and can add to or modify the requirements. 18 U.S.C. § 4209(d)(1) (repealed 1984).

While § 4206 on its face requires the Commission only to determine whether release would jeopardize the public welfare, that analysis cannot be done in a vacuum. It must include a realistic and complete evaluation of what Mr. Alexander's release might look like. This includes a determination of how potential conditions would affect that risk to the public, which, in some cases, may be dramatic. For example, in 2003, the hearing examiner stated that "[t]he question at this point is whether [Mr. Alexander] has developed the mechanisms to handle stresses of every day life should he be returned to the community. . . This examiner has some concerns as to whether or not the subject has the ability to make that transition." R at 144. Conditions, such as daily reporting or electronic home monitoring, are precisely what might assist Mr. Alexander in this transition, preventing him from "acting out" and providing him structure. *Id*. Similarly, a continuation of daily therapy on an out-patient basis may help Mr. Alexander cope with the new "stresses" identified by the hearing examiner. Indeed, by the Commission's own analysis, the longer it waits to grant release, the greater Mr. Alexander's threat to society becomes: if the stress after "having been in custody for well over 20 years," *id.*, is sufficiently high that the transition into society is too risky to allow release, an additional ten years in prison will likely do little to ameliorate the problem. Because consideration of conditions

-16-

might well alter the Commission's calculus under § 4206(a)(2), the district court was correct in ordering the Commission to consider them.

We are aware that, as the appellant notes, the district court was wrong to say that Mr. Alexander would "never be subject to unconditional discharge." R. at 220. Under 18 U.S.C. § 4211(c), Mr. Alexander must receive unconditional release after five years of parole unless the Commission can show that there is a "likelihood that the parolee will engage in conduct violating any criminal law." There is some possibility, then, that Mr. Alexander would eventually be free from the Commission's supervision. This, however, does not change our analysis. The Commission can certainly consider the impact of § 4211(c) on the efficacy of its proposed conditions, but this does not render consideration of those conditions any less important to an analysis of Mr. Alexander's danger to the public. Additionally, we note that if Mr. Alexander continues to struggle in his transition into society within his first five years of parole, this will likely serve as grounds for the continuation of supervision under § 4211(c).

Finally, we note that the Commission must consider conditions on release only when it conducts a § 4206(a)(2) analysis. The Commission may not always reach this factor. There may be times when release would so depreciate the seriousness of the offense, § 4206(a)(1), that denial is appropriate regardless of the defendant's demonstrated rehabilitation. In that case, the Commission need not consider conditions on parole, as the risk the inmate poses to the public does

-17-

not factor into the Commission's decision to deny parole. However, this was not the case here, as the Commission conducted the § 4206(a)(2) evaluation.

## C. Creation of a Pre-Release Program

The district court also ordered the Commission to develop a pre-release plan. The Commission argues that it is not required to create this plan until it determines parole is appropriate, which it has not yet done.

The district court's decision that the Commission must develop a release plan is appropriate insofar as the Commission must consider the required elements of the release plan when evaluating the risk Mr. Alexander poses to the public under § 4206(a)(2). However, we cannot agree with the court's order to set a pre-release date and begin the process toward parole. We believe that this holding was a usurpation of authority vested in the Commission. Although the district court was correct in requiring the Commission to consider release conditions, the Commission is entitled to consider that newly calculated factor in conjunction with § 4206(a)(1), the seriousness of the offense, and of course, Mr. Alexander's demonstrated rehabilitation. Therefore, to require the Commission to set a release date is premature at this juncture.

The Commission, for example, may believe that Mr. Alexander's release would depreciate the seriousness of the offense so much as to outweigh his rehabilitation. Similarly, the Commission may still find that Mr. Alexander poses a risk to the public even given potential conditions. For example, the

-18-

Commission has in the past relied on Mr. Alexander's apparent lack of remorse in evaluating the risk to the public. 28 C.F.R. § 2.64(d)(2); *Paz v. Warden*, 787 F.2d 469, 473 (10th Cir. 1986) ("We recognize that an offender's inability to accept responsibility for the wrongfulness of his conduct may properly be considered by the Parole Commission in determining that the offender has not been rehabilitated."). The Commission might also decide that Mr. Alexander's lack of remorse is relevant to a § 4206(a)(1) determination, as release would promote "disrespect for the law." We do not comment on whether or not reliance on that single attribute could make a denial of his parole arbitrary and capricious, though we note that the Commission must give sufficient weight to all factors, including rehabilitation. *See Paz*, 787 F.2d at 473 ("By overemphasizing [a lack of remorse] in its release decision, and by closing its eyes to overwhelming evidence establishing that Mr. Paz was rehabilitated, we do not think the Commission has complied with the requirements of the YCA, as interpreted in *Watts*."). Nor do we decide at this point whether it would be arbitrary and capricious to hold that, twenty-five years after he was sentenced under the YCA, the seriousness of the offense still outweighs Mr. Alexander's rehabilitation. The authority to make these determinations in the first instance is vested in the Commission—not in the district court.

### III. CONCLUSION

Because it is not certain that, even if the conditions on release are considered, the Commission will decide that release is appropriate, we give the Commission another chance to evaluate Mr. Alexander's status. Of course, Mr. Alexander will have leave to file a subsequent habeas petition should the Commission deny his parole. We therefore reverse the district court's decision ordering the development of the pre-release plan and a pre-release date.

We **AFFIRM** the district court insofar as it required the Commission to take into consideration possible conditions on release, but **REVERSE** the district court insofar as it required the Commission to set a release date and to develop and follow a pre-release plan. The case should be remanded to the Commission for further proceedings in accordance with this opinion.

The Appellee's Motion to Dismiss is **DENIED**.